**Terry C. KNAPP, Plaintiff-Appellee, Cross-Appellant,**

v.

**Harry WHITAKER, Russell McDavid, John Hatton, Peoria School District No. 150, a body politic and corporate, and George Burdette, Defendants-Appellants, Cross-Appellees.**

No. 84–1032, 84–1060.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1984.

Decided March 5, 1985.

Rehearing and Rehearing In Banc Denied April 2, 1985.

Phillip B. Lenzini, Kavanagh, Scully, Sudow, White & Frederick, P.C., Peoria, Ill., for defendants-appellants, cross-appellees.

Patricia C. Benassi, Benassi & Benassi, P.C., Peoria, Ill., for plaintiff-appellee, cross-appellant.

Before COFFEY and FLAUM, Circuit Judges and CAMPBELL, Senior District Judge.*

COFFEY, Circuit Judge.

The defendants-appellants, Peoria School District No. 150, *et al.*, appeal the jury's finding that employees of the School District infringed upon Terry Knapp's First Amendment right to speak on matters of public concern, in violation of 42 U.S.C.

§ 1983. The jury awarded Knapp $514,333 in compensatory damages. On cross-appeal, Knapp appeals the district court's denial of his motion to include a claim for punitive damages. We affirm the jury's finding that the Peoria School District infringed upon Knapp's constitutional right to free speech and we affirm the denial of Knapp's punitive damage claim, but we remand this case to the district court with instructions to reduce the excessive compensatory damage award to an amount between $200,000 and $400,000. We further direct the district court, on remand, to provide the parties with findings of fact on the issue of Knapp's certification to teach high school level science courses in the State of Illinois.

I

The record reveals that in September 1977, Russell McDavid, the principal of Woodruff High School in Peoria, Illinois, hired the plaintiff, Terry Knapp, to teach biology in the science department at Woodruff and also serve as an assistant basketball coach and an assistant baseball coach.[1] According to the administrative procedures at Woodruff High School, a newly hired teacher receives two written evaluations each academic year and upon the completion of two full years of acceptable performance, the teacher is placed on tenured status. During the relevant time period, September 1977 to July 1982, the teacher evaluations at Woodruff High School were performed by the school's administrative assistant, John Hatton. On November 14, 1977, Hatton conducted his first evaluation of Knapp and stated, *inter alia*, that "Mr.

---

* The Honorable William J. Campbell, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

1. The defendants' brief on appeal contains a portion of a letter, dated March 23, 1983, from William Helton, Assistant Manager for the Illinois State Board of Education, stating that:
   "Based upon the transcripts presented for Mr. Terry Carl Knapp, he is not qualified to teach science or health education at the high school level. Qualifications for science have remained the same since 1971 which was prior

to his original employment within Peoria School District 150."
The defendants claim that they presented this letter to the district court on March 24, 1983, some six days before the court granted equitable relief and reassigned Terry Knapp to his position as biology teacher at Woodruff High School. Upon review of the district court record, we are unable to locate a copy of the complete letter, any reference to the letter by the district court, or any evidence in support of the defendants' claim.

Knapp has done a good job thus far in both the classroom and with his extracurricular assignments." On March 21, 1978, Hatton performed a second evaluation and wrote that "Mr. Knapp continues to do a good job as a teacher and coach at Woodruff.... Hopefully he will continue to perform at his current high level and maintain his co-operative attitude." The following academic year, on January 11, 1979, Hatton again evaluated Knapp, stating that "[i]n summary Mr. Knapp is a good teacher and coach. It is hoped that he will continue to make a contribution to our youth." On March 30, 1979, Hatton evaluated Knapp for the fourth time and wrote, "Mr. Knapp continues to do a good job. He is a very good classroom teacher whose knowledge, presentation and general enthusiastic attitude insures a high degree of learning for his students." Hatton added that "Mr. Knapp is very enthusiastic and intense in both his teaching and his coaching. He does have, however, a tendency at times to be too opinionated and outspoken." At the close of the 1978–79 academic year, Knapp was placed on tenured status in accord with the administrative policy at Woodruff High School.[2]

In March of the 1979–80 academic year, Knapp resigned his position as assistant basketball coach due to disagreements with the head coach and increasing family obligations. At the same time, March 1980, Knapp submitted a reimbursement request to the Woodruff athletic director for the 400 to 500 miles he logged while traveling to area high schools to scout opposing teams and while transporting players to and from basketball games in his own automobile. Knapp requested a reimbursement of 20¢ per mile but was informed by the Woodruff athletic director that he would receive only 12¢ a mile. Knapp complained that this policy was unfair, especially in view of evidence that teachers at all schools in District 150, including Woodruff, and coaches at other Peoria public schools received a mileage allowance of 20¢ per mile. The Woodruff principal, Russell

McDavid, explained that teachers who used their own vehicles to attend educational seminars and to transport students for educational purposes (i.e. field trips) were reimbursed directly by School District 150 at the uniform rate of 20¢ per mile. McDavid added that coaches were not reimbursed for their school-related travel expenses by the School District, instead each coach received a mileage allowance drawn from the athletic budget of his particular school. The Woodruff athletic budget consisted of $10,000 in public funds from School District 150, athletic booster club donations, fundraising proceeds, and gate receipts from the various Woodruff sporting events. According to McDavid, he independently decided upon the 12¢ per mile travel reimbursement figure when the comptroller of District 150 informed him, in the fall of 1979, of the possibility that Woodruff's $10,000 in public funds may not be forthcoming for the 1979–80 academic year. Knapp claims that he attempted to grieve this mileage allowance issue as an "unfair labor practice" but that his union representative was told by George Burdette, assistant superintendent of the Peoria School District, the claim was not grievable. In any event, Knapp did not file a formal grievance on the mileage allowance issue during the 1979–80 academic year.

Later in the spring of the 1979–80 school year, Knapp approached administrative assistant Hatton and inquired as to why he had not, to date, received an evaluation and why his schedule for the following academic year was not yet complete. Hatton responded that there were "inconsistencies in the figures we have gotten back from data processing" that accounted for the delay in compiling the schedule and also for the interrupted evaluation process. According to Hatton, when he informed Knapp of the reason, Knapp "started screaming ... 'You're trying to screw me.' 'I'm getting hosed.' 'You're trying to transfer me.' 'My evaluation is not done.' 'You're not man enough to get this done.'" The fol-

---

**2.** The record reveals that in Peoria School District 150, a tenured teacher receives a continu-

ous contract that remains in effect until the teacher resigns or is removed from his position.

lowing day, Knapp contacted Hatton and apologized for his behavior. Hatton responded that he was "willing to forget the thing" and thus in an evaluation on May 27, 1980, Hatton simply stated that "Mr. Knapp's classes are orderly and informative. He spends much time in his coaching duties."

At the beginning of the 1980–81 academic year, Knapp continued to express concern over the mileage allowance provided for Woodruff coaches, as well as the liability insurance coverage for coaches and volunteer parents in the School District who transported student-athletes in their private vehicles. According to Knapp, he had been informed of "a one million dollar umbrella policy carried by the district, that [coaches] were responsible for the first million dollar [sic] of coverage and then the School Board would pick up the remainder." Knapp further believed that the School District's insurance policy did not cover those parents who voluntarily transported student-athletes to school-related events.[3] As the 1980–81 school year progressed, Knapp joined with other teachers of the Peoria School District in demanding that a revised grievance procedure be included in the collective bargaining agreement then being negotiated between the teacher's union and the School District. On October 20, 1980, Knapp attended a meeting of the Peoria Board of Education ("School Board") where Board member Cleaver "asked teachers to let her know if the [grievance] policy was not working." In response to this request, Knapp contacted another Board member, Dr. Glover, about "an administrative policy or decision that was made at Woodruff High School and it was related to mileage for coaches and insurance for coaches or parents or students who transported students." Knapp also contacted Board member Hoerr

to discuss the mileage allowance for coaches at Woodruff, the liability insurance provided by the School District, and the change in his classroom assignment. Hoerr added that Knapp:

"also expressed a great deal of concern and criticism of the administration of the high school, who were not receptive to his complaints and whom he felt were not giving him satisfaction in terms of the grievance procedure and he was not getting the desired effect that he felt was due him."

On March 24, 1981, Knapp filed a formal grievance with the School District on the issue of liability insurance and the issue of inequitable mileage allowance for Woodruff coaches. According to Knapp:

"District No. 150 is discriminating against the coaching staff by paying some coaches 12¢ per mile and not paying some at all, while other traveling is reimbursed at 20¢ per mile. The grievant also charges that the District is placing coaches in a perilous position by requiring them to drive to and from game situations at their own risk without the protection of liability insurance for those duties."

Pursuant to Board Policy 4116.2 of Peoria School District No. 150, the first step of the grievance procedure is to discuss the problem "with the aggrieved person's principal with the objective of resolving the matter informally." If the grievant is not satisfied with the principal's decision, he may proceed to the second level and submit the grievance to the Committee on Professional Rights and Responsibilities. If the grievant remains unsatisfied with the Committee's ruling he may appeal the decision to a body composed of the superintendent and a three person grievance subcommittee. Finally, if the grievant is still not

---

**3.** Ill.Rev.Stat. ch. 122 §§ 10–20.20, 10–22.34 (1983) provide that a School District must indemnify and protect all School District employees and authorized volunteer personnel against "death and bodily injury and property damage claims and suits, including defense thereof, when damages are sought for negligent or wrongful acts alleged to have been committed

in the scope of employment or under the direction of the board." The record reveals, however, that no administrative officials of the Peoria School District nor members of the Peoria School Board informed Knapp of the state-mandated indemnification policy until after commencement of this lawsuit.

satisfied with the result, he may present his claim to the Peoria School Board. In compliance with level one of the grievance procedure, principal McDavid reviewed Knapp's complaint and on March 27, 1981, McDavid informed Knapp, in writing, that "the situations did not qualify as 'grievances' under the definition of 'grievance' in Board Policy 4116.2." The relevant section provides that "[a] 'grievance' is a condition in the school system which an individual teacher believes is wrong, unjust, or oppressive, but excluding issues such as changes in salary and policy of the Board of Education which relates to teachers as a whole." McDavid denied the grievance, concluding that Knapp's claims were "class actions" relating to coaches as a whole.

Following receipt of principal McDavid's response, Knapp contacted members of the Peoria School Board seeking sponsorship to speak at the next School Board meeting, scheduled for April 6, 1981.[4] Knapp mailed a copy of his March 24 grievance to each Board member and enclosed a note stating that "I have talked to [board members] Dr. Glover and Mr. Hoerr concerning the material included. I will be in touch early next week." Harry Whitaker, the superintendent of District 150, learned of Knapp's contacts with Board members and on April 1, 1981, he met with Knapp to inform him that under Board Policy 2111.10(11) of the Peoria School District, communications to the Board must be directed through the superintendent.[5] According to Whitaker, he informed Knapp that the "Board policy that covers the superintendent of schools says that ... all communications to the Board members will go through the superintendent." Knapp claims that he was told "[i]f you ever contact a board member about any educational issue, I will find you insubordinate and act accordingly." Following this meeting, Whitaker sent a "priv-

ileged communication" to each School Board member, providing in relevant part:

"I asked for a meeting with Terry and met with him this morning. I pointed out that Board Policy 2111.10, Superintendent of Schools, Item #11 states 'communicate, or cause to be communicated to all employees all actions of the Board relating to the several employees, and all communications made to the Board shall be through him.' I pointed out that this wasn't the first time that he was outside of Board policy and from now on communication with the Board should go through the superintendent. He was very argumentative, as always, and said that Board members encouraged him to call them, write them, etc. and that he was going to pay attention to the Board members. I again pointed out to him that he is outside of Board policy and that I expected him to stay within Board policy.

If Terry continues to bypass the administration with regard to communications, I am going to recommend his dismissal."

The next day, April 2, 1981, superintendent Whitaker placed a letter in Knapp's personnel file summarizing the content of the April 1 conversation and stating in pertinent part:

"I asked for the conference with Terry to point out to him that he is in violation of Board Policy 2111.10 which deals with communications being made to Board members without first sending those communication [sic] to the superintendent of schools. This has been taking place for some time and I have not been concerned. However I believe now it has become somewhat of a problem. I asked Terry at the conference to stay within Board policy. I don't believe that he was aware that he was in violation of Board policy and I believe he will not deliberate-

---

4. Board Policy 1120.10 of Peoria School District No. 150, provides that an individual must receive sponsorship from at least one Board member in order to address the Board about an item not appearing on the official agenda.

5. Board Policy 2111.10(11) of Peoria School District No. 150 provides that the superintendent shall "[c]ommunicate, or cause to be communicated, to all employees, all actions of the Board relating to the several employees, and all communications made to the Board shall be through [the superintendent]."

ly violate the policy in the future. He has been asked to remediate this aspect of his conduct."

On Friday, April 3, 1981, Knapp approached principal McDavid and asked, in writing, for a "personal day" with pay, for the following Monday, because "I would like to use Monday April 6 to consult my lawyer about threats made to me by Mr. Harry Whitaker concerning my job." Pursuant to Administrative Procedure 4152.7 of the Peoria School District, "[t]he principal or immediate supervisor may grant an employee a maximum of two days per year for urgent and compelling personal business which cannot be conducted at any other time." McDavid explained that Knapp could see an attorney during non-school hours and thus the principal denied the request. Knapp responded that in light of his April 1 conversation with superintendent Whitaker, he feared that he would be fired for insubordination. Knapp added, in writing, that "[t]his has to be done for my personal protection before Monday's [April 6] board meeting. This is the only time my lawyer was free." McDavid phoned assistant superintendent Burdette and asked for his advice. Burdette knew that Knapp was not about to be fired, as such an action would have to be approved by the office of the assistant superintendent, and thus Burdette saw no compelling or "pressing reason that we should pay a teacher to see a lawyer under these conditions." McDavid formally denied Knapp's request and instructed him to return to class. During the following period Knapp became dizzy and nauseous, experiencing severe pains in his chest and arms that he believed to be warning signs of a heart attack. Knapp was transported, by a fellow Woodruff teacher, to the doctor's office where he was examined, given a prescription for medication, and instructed to rest for the weekend.

The following Monday, April 6, 1981, Knapp appeared at the School Board meeting, distributed an eleven page statement to each Board member, and informed the Board, in his prepared and oral remarks, that the grievance procedure was functioning ineffectively. As a specific example, Knapp related that principal McDavid denied his March 24 grievance—on the issues of the inequitable mileage allowance for Woodruff coaches and the School District's liability insurance policy—because the claims were non-grievable. In response to Knapp's statement, assistant superintendent Burdette, "outlined the exact steps of a Grievance Procedure. If the complaint is grievable, the final level is the Board of Education. If the administration feels the complaint is not grievable, nothing more happens." In addition, superintendent Whitaker explained to the School Board members that under the terms of the present collective bargaining agreement in District 150, "a complaint is not grievable if a teacher is not treated differently from other teachers in the building."

Following the School Board meeting, Knapp returned to Woodruff where he continued to teach biology courses and serve as an assistant baseball coach. On April 24, 1981, Knapp filed a second grievance with the School District, this time claiming that:

"On April 2, 1981 I submitted a written request for a personal day for legal matters. The day asked for was April 6, 1981. On April 3, 1981 the request was denied by my principal. It is my understanding that legal days are a part of my contract as a valid personal day." [6]

Principal McDavid reviewed the request and responded, in writing, that "this was not a grievable item." The next day, Saturday, April 25, 1981, Knapp coached a doubleheader baseball game and in the locker room afterward, he removed his elastic stocking only to observe an abnormal swelling in the upper calf region of his right leg. On the following Monday, April 27, 1981, Knapp visited a general practitioner, Dr. Lawless, who diagnosed the condition as phlebitis. Dr. Lawless prescribed

6. According to Administrative Procedure 4152.7 of the Peoria School District, "legal proceedings or legal transactions" are sufficient reasons for granting a "personal day" with pay.

medication and recommended that Knapp elevate the leg while resting at home for the remainder of the week.

On Wednesday, April 29, 1981, administrative assistant Hatton completed a year-end evaluation of Knapp, stating that:

"Mr. Knapp spends too much time dwelling upon negative issues. He spends a great deal of time each day berating the performance of other faculty members, members of the administration of Woodruff, and the central administrative staff. He is consistently undermining the policies, procedures and general effectiveness of this school and the school district. This has a damaging effect in both the school and community.

\*       \*       \*       \*       \*       \*

On several occasions he has contacted school board members concerning personal employment problems. Problems of this nature are to be discussed with the building principal or, as stated in Board Policy 2111.10, to the office of the superintendent. Mr. Knapp is to refrain from contacting board members or speaking at public meetings concerning his personal employment relationships.

He is, however, allowed to contact board members about matters of general public interest. His insistence on airing personal problems directly with the board is disruptive and will not be tolerated.

In conclusion, if the above stated problems are remediated and Mr. Knapp tends to the business of teaching, the potential exists for him to become a good teacher. It is hoped that he will correct his problems and live up to his potential. The members of the administration stand ready to assist him in a normal manner to correct these problems."

In addition, Hatton recommended that Knapp be placed on remediation status, meaning that Knapp's employment would continue as long as he corrected the problems alluded to in the evaluation. Two days later, on Friday, May 1, 1981, Knapp returned to school to discuss a lesson plan with his substitute teacher and to retrieve some papers from his classroom. While checking his intra-office mail, Knapp learned that Hatton had completed the evaluation and wanted to discuss the content with him. Hatton presented the evaluation to Knapp who read it, became infuriated, and complained that "my leg started throbbing, my hands were sweating, my face was sweating, my intestines were cramping." Knapp claims that when he proceeded to the door of Hatton's office, the administrative assistant told him, "you cannot leave this office without signing this evaluation right now." According to Hatton, he informed Knapp that "you're not supposed to leave without signing this evaluation. It doesn't mean that you agree with it."

On Monday, May 4, 1981, Knapp did not return to Woodruff but had his union representative file a third grievance with the Peoria School District, claiming that:

"Pursuant to the Board's Grievance Policy no individual shall be punished nor harassed for attempting to implement the grievance procedure. I am filing a grievance because of the continued harassment I have received since filing my original grievance. I have been harassed for filing grievances to the point that my health is being impaired and my ability to function as a classroom teacher is being greatly impaired. I have filed two previous grievances. The first dealt with inequitable mileage compensation and lack of adequate liability coverage. The second grievance was filed because my Principal denied me a personal day for legal councel [sic] stemming from the first grievance and ensuing harassment. The harassment can be summarized to date as:

1. Superintendent Whitaker's threats and remediation for communicating with Board members.

2. Dr. McDavid's denial of a personal day for legal use.

3. Mr. Hatton's grossly unfair teacher evaluation.

4. Mr. Hatton's curricular reassignment for next year.

5. Mr. Hatton's threat that I must sign my evaluation before I could leave his office and his follow-up denial in front of Mr. Clemmer."

On May 8, 1981, Knapp again visited Dr. Lawless complaining of recurring nausea, loss of appetite, vomiting, and headaches, along with pain in his right leg. Dr. Lawless diagnosed Knapp as suffering from acute anxiety and arranged for Knapp to meet with a psychologist, to evaluate the anxiety condition, as well as a vascular surgeon, to determine the severity of Knapp's phlebitis condition. Finally, Dr. Lawless recommended to Knapp's superiors that he be placed on a temporary leave of absence.

Knapp did not return to Woodruff for the remainder of the 1980–81 academic year. In June 1981, during the summer vacation period, principal McDavid phoned Knapp to discuss the phlebitis condition and to determine Knapp's ability to serve as an assistant baseball coach at Woodruff for the upcoming 1981–82 school year. McDavid informed Knapp that "I really need someone that is healthy and reliable." Knapp responded that:

"I was currently seeing a psychologist and a cardio-vascular surgeon and that at that present time the cardio-vascular surgeon scheduled a venogram to determine the extent of the phlebitical condition that I had at that time, and I was to have the venogram and then he would consider whether or not surgery was necessary. So I told him basically 'surgery is possible at this time.'"

According to Knapp, he further informed McDavid that "[t]he doctor said even if I require surgery or stripping a vein, that it shouldn't be any problem and that I would be able to resume my coaching duties in the spring." At the close of this conversation, McDavid relieved Knapp of his assistant baseball coaching position, noting that:

"The different factors basically were, of course, he was at that time telling me that he couldn't coach baseball because baseball was causing illness, phlebitis. Along with that was reliability which I

consider basically the same thing, I didn't know whether he was going to be there or not, which caused some problem with his other coaching—having to take his teams to games, and so forth. Basically I'd have to say that some of it went really back to the past year when he resigned his [basketball] coaching position. I was very unhappy about that and I think Terry and I talked about that after it was over...."

In August 1981, Knapp received a medical release to return to his teaching duties and upon arrival at Woodruff, he learned that his schedule no longer included study-hall supervision, a position for which teachers in District 150 receive extra compensation. On November 12, 1981, Knapp filed the instant lawsuit, alleging, *inter alia*, that the defendants, "acting in concert, have commenced a plan and course of action to penalize Plaintiff for his exercise of the First Amendment right to make known his views on matters of public importance in a lawful and legitimate manner," in violation of 42 U.S.C. § 1983. During the course of the 1981–82 academic year, it became evident that the Peoria School District would have to dismiss between 140 and 160 teachers the following year "due to declining enrollment and economic conditions." As a result, the School District terminated many non-tenured teachers and transferred numerous tenured teachers, based chiefly upon their years of seniority within a department, to other schools within the District. Knapp had accumulated the least amount of seniority among the five teachers in the science department at Woodruff High School. Thus, on April 13, 1982, Byron McCormick, personnel director for the Peoria schools, informed Knapp, in writing, that "unless unforseen changes occur, it will be necessary to transfer you to a different building assignment, effective with the 1982–83 school year." Following receipt of this letter, Knapp sought interviews at Peoria Central High School where teachers with coaching experience were needed in the science, health, and physical education departments. According to assistant superintendent Burdette, the princi-

pal at Peoria Central "did not think it was necessary to interview [Knapp] because he knew [Knapp] and, being a veteran coach and administrator in our district, was well aware of [Knapp's] coaching experience."

On April 29, 1982, administrative assistant Hatton completed another year-end evaluation of Knapp, stating, in relevant part, that:

"Mr. Knapp was issued a 'remediation required' category on his evaluation for last year. He appears at this time to have satisfactorily resolved most of the deficiencies that were cited on this evaluation.

While I still feel that Mr. Knapp's attitude is a problem, it is difficult for me to evaluate as I am currently a defendant in a lawsuit in which he is the plaintiff. I can no longer be impartial, therefore, I will not comment on this area."

On May 4, 1982, Knapp filed a fourth grievance with the district, this time complaining that Hatton's evaluation failed to "follow the board's own procedure in evaluation of remediated teachers." Assistant superintendent Burdette responded in a letter of May 6, 1982, that:

"Your latest grievance alleging harrassment [sic] as a result of the April 29th evaluation report appears to us to be nothing more than a thinly veiled attempt to fabricate evidence in support of your lawsuit against this district. Mr. Hatton gave you a satisfactory evaluation that requires no remediation. Since you were formally evaluated last year, it was not necessary to adhere to the formal evaluation procedures this year. Mr. Hatton is required by Board Policy to evaluate you. This evaluation procedure is Board Policy and is not grievable by you or any other employee. Accordingly, the matters raised in the grievance are not grievable."

On May 19, 1982, Knapp filed another grievance on the very same topic—Hatton's April 29 evaluation—which was again denied. Burdette informed Knapp, in writing, that the grievance "certainly appears to be an attempt to harass the administra-

tion at a time when their attention is needed to the many things necessary to have a successful conclusion of the school year for our students."

On July 16, 1982, the personnel director of the Peoria schools sent Knapp another letter, this time informing him that he was officially transferred to Harrison Grade School where he would teach science and math at the seventh and eighth grade levels. On July 27, 1982, Knapp submitted a fifth grievance, protesting "my involuntary transfer from Woodruff High School to Harrison Grade School." Knapp alleged that "had I not been improperly fired from coaching Sophmore baseball I would still be assigned next year to Woodruff." In support of this claim Knapp cited three examples of teachers at Woodruff, who held coaching positions, that were not transferred despite the fact they had less seniority than other teachers within their respective departments. Knapp further claimed that "I was never granted an interview for any of the three positions at Peoria High … nor was I granted any interviews that would better match my background and certifications." Knapp presented the grievance to principal McDavid at level one, assistant superintendent Burdette and the Professional Rights and Responsibilities Committee at level two, and superintendent Whitaker at level three. Knapp's claim was considered grievable but was denied at all three levels on the basis that the School District acted properly.

On November 22, 1982, one year after the filing of this civil rights lawsuit and some three months after entry of the final pretrial order, Knapp requested leave to amend his complaint to include a claim for punitive damages. On December 17, 1982, the district court denied the request because "substantial prejudice will result to the Defendants if the Plaintiff is permitted to add a punitive damage claim." The case proceeded to trial and at the close of the evidence on February 1, 1983, the district judge ruled, from the bench, that "the speech involved in this case, the contact with the Board members orally, I mean

over the phone in their homes, at the Board meeting, which is already admitted and even the transmittal to them of written documents is protected speech" under the First Amendment. In accord with this legal ruling, the court instructed the jury that:

"The court finds that School Board Regulation 2111.11 [sic] directing that communications to Board members be made through the Office of the Superintendent is unenforceable. The actions by Terry Knapp in speaking to Board members, both individually and at a public meeting, were protected by the First Amendment of the Constitution of the United States. The court also finds that the following conduct violated Terry Knapp's rights:
1. The oral reprimand given to Terry Knapp by Harry Whitaker on April 1, 1981.
2. The language contained in the memorandum written by Harry Whitaker to the Board of Education of District 150 on April 1, 1981 referring to Terry Knapp's violation of Board policy.
3. The written reprimand prepared on April 2 by Harry Whitaker and given to Terry Knapp on April 6.
4. The language placed in Terry Knapp's April 29, 1981, evaluation referring to his violation of Board policy."

The court further instructed the jury that based upon the evidence presented, they were to answer the following specific interrogatories:

"1. Was the plaintiff's constitutionally protected conduct a substantial or motivating factor in the defendants' decision to transfer plaintiff to Harrison School? ...
2. Would the defendants have taken the same action even if the plaintiff had not engaged in constitutionally protected conduct?

\*    \*    \*    \*    \*    \*

1. Was the plaintiff's constitutionally protected conduct a substantial or motivating factor in the defendants' decision to deny plaintiff a personal leave day with pay? ...

2. Would the defendants have taken the same action even if the plaintiff had not engaged in constitutionally protected conduct?

\*    \*    \*    \*    \*    \*

1. Was the plaintiff's constitutionally protected conduct a substantial or motivating factor in the defendants' decision to give plaintiff negative evaluations? ...
2. Would the defendants have taken the same action even if the plaintiff had not engaged in constitutionally protected conduct?

\*    \*    \*    \*    \*    \*

1. Was the plaintiff's constitutionally protected conduct a substantial or motivating factor in the defendants' decision to remove him as assistant baseball coach? ...
2. Would the defendants have taken the same action even if the plaintiff had not engaged in constitutionally protected conduct?"

The jury found that Knapp's constitutionally protected speech was a substantial or motivating factor in each of the defendants' four decisions and that the defendants would not have taken such action if Knapp had not engaged in such speech. Based upon these findings, the jury awarded Knapp $514,333 in compensatory damages. On March 30, 1983, the district court granted Knapp the following equitable relief:

"All copies of written memoranda dated April 1, 1981, and April 2, 1981, and all references to any violation of Board Policy 2111.10 by Plaintiff are to be expunged from all files maintained by the Defendants.

All copies of the evaluation of Plaintiff dated April 29, 1981, and April 29, 1982, authored by John Hatton and all documentation in support thereof be removed from all files maintained by the Defendants.

\*    \*    \*    \*    \*    \*

Plaintiff shall be transferred from Harrison Grade School to Woodruff High School and shall be reassigned duties as assistant baseball coach."

The court stayed the equitable relief order, pending appeal, directing that the expunged material be delivered to the defendants' counsel and that the defendants notify the district court of any vacancies occurring at Woodruff High School.

On April 22, 1983, the defendants filed a notice of appeal in this court and in an unpublished order of June 30, 1983, we remanded the case for reconsideration in light of the Supreme Court's decision in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("*Connick*"). On remand, the district court ruled, *inter alia*, that "while *Connick* may be factually distinguishable from our case, even the application of the principles set forth in *Connick* do not support a change in any earlier rulings by this court." 577 F.Supp. 1265, 1270. According to the court, "Mr. Knapp's speech, with its focus on the operation of the grievance procedure, was a matter of public concern." at 1271. The defendants appeal the district court's ruling that Knapp engaged in constitutionally protected speech, the sufficiency of the evidence introduced at trial, the alleged trial errors, and the legal and equitable relief awarded. Knapp cross-appeals the district court's refusal to permit a punitive damage claim.

## II

### A. PROTECTED SPEECH

The defendants initially contend that the district court erred in ruling, as a matter of law, that Knapp's speech to members of the Peoria School Board was a matter of public concern protected under the First Amendment. According to the defendants, Knapp's speech focused only upon the job-related, personal issues of classroom assignment, evaluation content, mileage allowance for coaches at Woodruff, liability insurance for coaches and volunteer parents of School District 150, and the grievance procedure as it related to Knapp's particular disputes. The defendants rely upon the Supreme Court's language in *Connick* that:

> "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."

461 U.S. at 147, 103 S.Ct. at 1690. The defendants claim that Knapp's speech was not a matter of public concern and thus was not protected by the First Amendment.

We begin our analysis with the Supreme Court's decision in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ("*Pickering*"). In that case, a public high school teacher was dismissed for submitting, to the editor of a local newspaper, a factually inaccurate letter that criticized the local School Board for its past allocation of bond revenues and the local school superintendent for attempting to prevent teachers from opposing a newly proposed bond issuance. The Court ruled that the teacher's speech was a matter of "legitimate public concern on which ... free and open debate is vital to informed decision-making by the electorate." *Id.* at 571–72, 88 S.Ct. at 1736–37. The court further reasoned that:

> "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

*Id.* at 568, 88 S.Ct. at 1734. *See also Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 414, 99 S.Ct. 693, 696, 58 L.Ed.2d 619 (1979); *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977). In balancing the competing interests, the Court considered that the teacher's speech was not directed toward anyone with whom

he had daily contact; the speech did not affect harmony among co-workers or the maintenance of discipline by immediate superiors; and the teacher's employment relationship with the School Board and the superintendent did not require personal loyalty and confidence for proper functioning. In view of this evidence, the Court ruled that "absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Pickering*, 391 U.S. at 574, 88 S.Ct. at 1737 (footnote omitted).

More recently, the Supreme Court in *Connick* refined the method for analyzing a case involving the First Amendment rights of a public employee. In *Connick*, an assistant district attorney was dismissed for insubordination after she circulated a questionnaire concerning internal office affairs. The questionnaire attempted to solicit staff members' views on the office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. In considering the assistant district attorney's claim that distribution of the questionnaire was protected speech under the First Amendment, the Supreme Court explained that the constitutional analysis involves a two-step process. *See Yoggerst v. Hedges*, 739 F.2d 293, 295 (7th Cir.1984). The initial inquiry is whether the speech is a matter of public concern, for "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689. If the speech is deemed a matter of public concern, the court must then engage in the *Pickering* balancing test, weighing the interest of the public employee, as a citizen, in commenting upon matters of public concern with the interest of the State, as an employer, in promoting effective and effi-

cient public service. The Supreme Court added that "[t]he inquiry into the protective status of speech is one of law, not fact." *Id.* at 148 n. 7, 103 S.Ct. at 1690 n. 7.

Within this analytical framework, the Court established that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690–91. In *Connick*, the Court considered that none of the questions, except the one about pressure to work in political campaigns, sought to evaluate the District Attorney's performance as an elected official; inform the public that the District Attorney's office was failing to discharge its governmental duties; or expose potential wrongdoing or breach of the public trust. Accordingly, the Court held that the questions were nothing more than one employee's dissatisfaction with office procedures that did "not fall under the rubric of matters of 'public concern.'" *Id.* at 148, 103 S.Ct. at 1690. The Court ruled, however, that "the issue of whether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak freely without fear of retaliatory dismissal." *Id.* at 149, 103 S.Ct. at 1691. Because the question of political campaign pressure involved a matter of public concern, the Court proceeded to the second analytical step—the *Pickering* balancing test—weighing the plaintiff's interest in discussing matters of public concern with the interest of the District Attorney's office in providing efficient services for the public. The Court considered numerous factors, including (1) whether the speech impeded the employee's ability to perform her responsibilities; (2) the importance of close working relationships with superiors and co-workers; (3) the time, place, and manner in which the speech was delivered; and (4) the context in which the underlying dispute arose. *Id.* at 150–54, 103 S.Ct. at 1691–94. *See also Zook v. Brown*, 748

F.2d 1161, 1166 (7th Cir.1984); *McBee v. Jim Hogg County, Tex.*, 730 F.2d 1009, 1013 (5th Cir.1984). Based upon these factors, the Court concluded that:

> "Myers' questionnaire touched upon matters of public concern in only a most limited sense; her survey, in our view, is most accurately characterized as an employee grievance concerning internal office policy. The limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships."

*Connick*, 461 U.S. at 154, 103 S.Ct. at 1693.

■ In the present case, the issue is whether Knapp's oral and written communications with members of the Peoria School Board are matters of public concern, protected under the First Amendment. We realize, of course, that "[b]ecause of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors ... to furnish grounds for dismissal, ... [there exists no] general standard against which all such statements may be judged." *Pickering*, 391 U.S. at 569, 88 S.Ct. at 1735. *See also Egger v. Phillips*, 710 F.2d 292, 315 (7th Cir.) (*en banc*), *cert. denied*, —— U.S. ——, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). In resolving Knapp's claim that the Peoria School District infringed upon his constitutional right to free speech, we are guided by the Supreme Court's analysis in *Pickering* and *Connick*. The record indicates that Knapp contacted School Board members concerning his classroom assignment; the content of administrative assistant Hatton's evaluations; the inequitable mileage allowance for Woodruff coaches; the liability insurance provided by Peoria School District No. 150 for coaches and volunteer parents who transport student-athletes to school-related activities; and the general ineffectiveness of the grievance procedure within District 150. The issues of Knapp's classroom assignment and the content of his evaluations are clearly personal matters relating solely to Knapp's employment at Woodruff.

Knapp's speech on these issues was not an attempt to inform the public that the administrators in District 150 were failing to discharge their governmental responsibilities. Moreover, Knapp's speech on these subjects was not aimed at uncovering a wrongdoing or breach of the public trust among Peoria School District administrators. Instead, Knapp simply disagreed with certain internal decisions made by his immediate superiors at Woodruff High School. While principal McDavid, as a matter of good judgment, should have been receptive to any constructive criticism offered by Knapp, "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 149, 103 S.Ct. at 1691. Accordingly, based upon the content, form, and context of Knapp's complaints about classroom assignment and evaluation content, we hold that such speech is a matter of personal concern, not a matter of public concern.

■ The issue of inequitable mileage allowance involves not only Knapp but all of the coaches at Woodruff who travel to area high schools to scout opposing teams and who transport student-athletes to school-related events in their own vehicles. According to the establishe dpolicy in District 150, each high school maintains a separate athletic budget to pay for such items as uniforms, equipment, and coaches' travel expenses. These athletic budgets generally consist of public funds distributed by the School District, as well as monies collected from athletic booster clubs, fundraisers, and gate receipts. At Woodruff, a substantial portion of the athletic budget ($10,000) consisted of public funds received from the Peoria School District. The comptroller of District 150 informed principal McDavid of the possibility that these funds may be cut for the 1979–80 academic year, and thus McDavid independently decided upon a 12¢ per mile reimbursement figure for Woodruff coaches. Knapp protested, on behalf of all coaches at Woodruff, that McDavid's decision was unfair as coaches at other Peoria public high schools received

20¢ per mile for travel expenses. In the context of this case, Knapp's complaint focused upon the inequitable allocation of public funds to a select group of Peoria area high school coaches. Indeed, McDavid testified that in computing the 12¢ per mile figure, he contacted three other high school principals in District 150 and discovered that "there was a difference from school to school" on the mileage allowance for coaches. The School District offered no explanation for the inequalities in athletic-related travel reimbursement nor did it promulgate any regulation to assure that public funds earmarked for athletic budgets be distributed evenly to coaches throughout the District. Knapp's speech to the School Board on the issue of mileage allowance was an attempt to inform the public and the educational policymakers of Peoria that officials in District 150 were failing in their duty to properly administer the allocation of public funds. Moreover, Knapp's speech on this topic enlightened the public to the fact that the School District paid teachers at Peoria high schools, including Woodruff, a uniform rate of 20¢ per mile for education-related travel, while coaches at Woodruff received a much lower rate of 12¢ per mile, even though their athletic budget consisted, in large measure, of public funds. In view of the content, form, and context of Knapp's speech on inequitable mileage allowance for Woodruff coaches, we hold that, in the context of this case, such speech is a matter of public concern.

The liability insurance coverage provided by School District 150 for all coaches and volunteer parents who transport student-athletes to school-related events in their own vehicles is, likewise, a matter of interest and concern to members of the Peoria community. In today's litigious society, a volunteer who gratuitously donates time and expense in transporting students is entitled to know the risks involved and the limits of the liability insurance coverage in the event of an unfortunate accident. Similarly, the citizens of Peoria, as taxpayers, have a financial interest in the terms of the School District's insurance policy and the amount of coverage provided when the School District is held liable for an accident involving a school employee or authorized volunteer personnel. The failure to provide the citizens of Peoria with such insurance information borders upon a breach of the School District's duty to inform the community of the public school system's policies concerning potential liabilities. At trial, the defendants established that the Peoria School District is required by Illinois state law to indemnify and protect all School District employees and authorized volunteer personnel against "death and bodily injury and property damage claims and suits, including defense thereof, when damages are sought for negligent or wrongful acts alleged to have been committed in the scope of employment or under the direction of the board." See Ill.Rev. Stat. ch. 122 §§ 10–20.20, 10–22.34 (1983). The record reveals, however, that the defendants never informed Knapp nor any members of the Peoria community of this state-mandated indemnification policy before Knapp presented the matter to the School Board. In fact, the varsity tennis coach at Woodruff submitted a formal letter of resignation due, in part, to his belief that the School District's liability insurance policy was inadequate. In view of the content, form, and context of Knapp's speech on liability insurance for coaches and volunteer parents who transport student-athletes to school-related events, we hold that such speech is a matter of public concern.

The functioning of a grievance procedure is generally an internal issue, important only to the teachers and School District employees who must use the procedure to air their complaints about employment conditions and practices. In the present case, however, the grievance procedure was the subject of ongoing collective bargaining negotiations between the teachers' union and the administrators of Peoria School District No. 150. Board member Ketay requested that teachers comment upon deficiencies in the grievance process and administrators of the School District openly sought input on the grievance procedure in order to ef-

fectively negotiate the issue with the teachers' union. In the context of this case, the grievance procedure was a legitimate matter of interest for the citizens of Peoria who, as taxpayers, had a financial stake in the settlement reached between the teachers and administrators in District 150. *See, e.g., McGill v. Board of Ed. of Pekin Elementary Sch.*, 602 F.2d 774, 778 (7th Cir.1979). The citizens of Peoria certainly were entitled to know the information relied upon by the School District in negotiating the new collective bargaining agreement. Knapp's speech to School Board members concerning the ineffectiveness of the grievance procedure, just as his speech on the issues of inequitable mileage allowance and liability insurance, informed the Peoria community of possible shortcomings in the management policies of the School District that could very well have a direct financial impact upon the entire taxpaying community. Thus, in view of the content, form, and context of Knapp's speech on the ineffectiveness of the grievance procedure in District 150, we hold that, in the context of this case, such speech is a matter of public concern.

In light of our conclusion that Knapp's speech involved matters of public concern, we proceed to the second analytical step—the *Pickering* balancing test—and weigh Knapp's interest, as a citizen, in discussing matters of public concern with the Peoria School Board against the School District's interest, as an employer, in promoting efficient public services by requiring that a teacher's communication to the School Board be channeled through the superintendent. The initial, and often determinative, question is whether the speech interferes with the employee's work or with the efficient and successful operation of the office. Knapp's speech clearly did not interfere with his teaching responsibilities, as Knapp continued to teach in the science department at Woodruff High School for more than a year after he spoke with the School Board members. Knapp's temporary leave of absence at the end of the 1980–81 academic year resulted from his medically documented condition of nervous anxiety and phlebitis. The record is void of any evidence suggesting that this temporary medical leave was caused by Knapp's communication with School Board members on the issues of inequitable mileage allowance, liability insurance, or the grievance procedure within District 150. Moreover, we are not presented with a ease of close working relationships between teachers and administrators in District 150, where Knapp's speech caused disruption or threatened to destroy employee morale within Woodruff High School much less the Peoria School District. Knapp's speech, on behalf of other teachers, coaches, and volunteer parents, was directed at certain policies of the School District, not at any particular person with whom he had daily contact. Knapp's speech did not affect discipline within Woodruff High School nor did it endanger the daily classroom routine. Indeed, the defendants admitted at trial that "we don't have a disruption issue here."

The record further reveals that the time, place, and manner in which Knapp delivered his speech to the School Board did not interfere with his teaching responsibilities. Knapp discussed the inequitable mileage allowance, the liability insurance, and the grievance procedure issues with Board members on his own time and at a regularly scheduled School Board meeting, with the sponsorship and approval of Board members. In addition, Knapp adhered to the internal rules of Peoria School District No. 150, vocalizing his complaints through the formal grievance process. Knapp's disagreement with the administrative policies of the Peoria School District arose, in part, from his experience with the grievance procedure at Woodruff High School. We are mindful that "[w]hen employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." *Connick*, 461 U.S. at 153, 103 S.Ct. at 1693. In the present case, how-

ever, Knapp was not permitted to challenge the inequitable mileage allowance and liability insurance issues at all four levels of the grievance procedure because principal McDavid deemed them non-grievable "class actions." Knapp's only available alternative was to bring these matters of public concern to the attention of the Peoria School Board members, the elected educational policymakers for the Peoria community.

We recognize that the Peoria School District has a legitimate interest in maintaining order by channeling a teacher's communication to the School Board through the superintendent. This practice clearly prevents the Board from being overburdened with personal, job-related issues more efficiently handled at the administrative level. Nevertheless, Knapp's speech to the School Board members on the issues of inequitable mileage allowance for Woodruff coaches, liability insurance for coaches and volunteer parents, and the ineffectiveness of the grievance procedure did not hinder the educational services provided within Woodruff High School nor did it threaten to disrupt the day-to-day administration of District 150. Thus, in the context of this case, the interest of the Peoria School District in promoting efficient educational services does not outweigh Knapp's right to discuss matters of public concern with the Peoria School Board. Accordingly, we hold that under the First Amendment analysis set forth in *Pickering* and *Connick,* Knapp's speech to the School Board concerning inequitable mileage allowance, liability insurance, and the grievance procedure are matters of public concern protected by the First Amendment to the United States Constitution.

## B. SUFFICIENCY OF THE EVIDENCE

In *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (*"Mt. Healthy"*), the Supreme Court concluded that a public employee who alleges a violation of his First Amendment right to free speech must "show that his conduct was constitutionally

protected, *and* that his conduct was a 'substantial factor'—or, to put it in other words, that it was a 'motivating factor'" for the defendant's actions. 429 U.S. at 287, 97 S.Ct. at 576 (emphasis added) (footnote omitted). We have already ruled that Knapp's speech to the School Board members concerning inequitable mileage allowance, liability insurance, and the grievance procedure was, as a matter of law, constitutionally protected. Thus, Knapp satisfied the initial burden of proof under *Mt. Healthy.* We now address the defendants' argument that Knapp failed to introduce sufficient evidence to satisfy the "substantial or motivating factor" prong of the *Mt. Healthy* test.

The jury expressly found that Knapp's constitutionally protected speech was a substantial or motivating factor in the defendants' decisions to deny Knapp a personal leave day with pay, to give Knapp negative evaluations, to remove Knapp as the assistant baseball coach, and to transfer Knapp to Harrison Grade School. It is well-settled in this circuit that "a jury verdict will not be set aside if a reasonable basis exists in the record to support that verdict." *Spesco v. General Electric Co.,* 719 F.2d 233, 237 (7th Cir.1983) (citing *Lenard v. Argento,* 699 F.2d 874, 882 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983)). *See also McGill v. Bd. of Ed. of Pekin Elementary Sch.,* 602 F.2d at 780. The credibility of the witnesses and the weight of the evidence are matters within the purview of the jury, especially in a case such as this which turns, in large measure, upon the defendants' motive in making certain decisions. *Lenard v. Argento,* 699 F.2d at 882. Moreover, we are to review the evidence in the light most favorable to the prevailing party; in this case Knapp.

The record reveals that on April 3, 1981, defendants McDavid and Burdette denied Knapp's "personal day" request to see an attorney, with full knowledge that the request related directly to the oral reprimand Knapp received from superintendent Whitaker, just two days previous, for personal-

ly contacting Board members. On April 29, 1981, defendant Hatton compiled an evaluation of Knapp's classroom performance and expressly stated that Knapp "is consistently undermining the policies, procedures and general effectiveness of this school and the school district.... His insistence on airing personal problems directly with the board is disruptive and will not be tolerated." Similarly, Hatton stated in his April 29, 1982 evaluation that, "[w]hile I still feel that Mr. Knapp's attitude is a problem, ... I am currently a defendant in a lawsuit in which [Knapp] is the plaintiff. I can no longer be impartial...." Principal McDavid removed Knapp from his baseball coaching position in June 1981, after Knapp had presented his claims of inequitable mileage allowance, inadequate liability insurance, and an ineffective grievance procedure to the Peoria School Board. Finally, on July 27, 1982, Knapp was transferred to Harrison Grade School with the approval of defendants Whitaker, Burdette, and McDavid, who were all well aware of Knapp's direct communication with the School Board members, and who all believed that Knapp's conduct violated Board Policy 2111.10(11), requiring that a teacher's communication to the School Board be directed through the superintendent. In view of this evidence, we hold that there exists a more than reasonable basis in the record to support the jury's finding that Knapp's constitutionally protected speech was a substantial or motivating factor in each of the defendants' foregoing decisions.

▮▮▮ In *Mt. Healthy,* the Supreme Court explained that once the plaintiff demonstrates his speech was constitutionally protected and such speech was a substantial or motivating factor in the defendant's actions, the defendant is entitled to demonstrate "by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct." 429 U.S. at 287, 97 S.Ct. at

576. *See also Givhan v. Western Line Consol. School Dist.,* 439 U.S. at 416, 99 S.Ct. at 697. In the present case, the defendants argue that under the third prong of the *Mt. Healthy* test, they introduced sufficient evidence to establish that the same decisions would have been reached, regardless of Knapp's constitutionally protected speech.[7] According to the defendants, the record contains evidence that Knapp's "personal day" request to see an attorney was denied by principal McDavid and assistant superintendent Burdette because Knapp failed to present his superiors with a compelling reason, as required by Administrative Procedure 4152.7, why he should receive a leave day with pay. The defendants contend that Knapp received negative evaluations because administrative assistant Hatton observed a pattern of attitude problems. The defendants claim that principal McDavid removed Knapp from his position as an assistant baseball coach at Woodruff due to Knapp's phlebitis condition. The defendants further argue that Knapp's transfer to Harrison Grade School resulted from his lack of seniority in the science department at Woodruff. We agree with the defendants that the record contains sufficient evidence to support each of the foregoing conclusions, however, the jury, after weighing the evidence and determining the credibility of the parties, returned a verdict in favor of Knapp. The jury expressly found that the defendants would not have denied Knapp a "personal day" with pay, given him negative evaluations, removed him from his assistant coaching position, or transferred him to Harrison Grade School if Knapp had not engaged in constitutionally protected speech. It is not our prerogative to invade the province of the jury in its weighing of the evidence and its determination of witness credibility. Because there exists a more than reasonable basis in the record to support a finding that Knapp's constitutionally protected speech caused the defendants' actions, we uphold the jury ver-

**7.** We note that for purposes of this section 1983 civil rights lawsuit, the defendants did not raise the affirmative defense of objective, good faith immunity as set forth in *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982).

dict. *See Crawford v. Garnier*, 719 F.2d 1317, 1322–23 (7th Cir.1983).

## C. ALLEGED TRIAL ERROR

■ The defendants raise various claims of alleged trial error, only one of which we deem worthy of discussion—jury instruction 10.[8] Following the district court's ruling that Knapp's speech was constitutionally protected, as a matter of law, the court instructed the jury:

> "The court finds that School Board Regulation 2111.11 [sic] directing that communications to Board members be made to the Office of the Superintendent is unenforceable. The actions by Terry Knapp in speaking to Board members, both individually and at a public meeting, were protected by the First Amendment of the Constitution of the United States. The court also finds that the following conduct violated Terry Knapp's rights:
> 1. The oral reprimand given to Terry Knapp by Harry Whitaker on April 1, 1981.
> 2. The language contained in the memorandum written by Harry Whitaker to the Board of Education of District 150 on April 1, 1981 referring to Terry Knapp's violation of Board policy.
> 3. The written reprimand prepared on April 2 by Harry Whitaker and given to Terry Knapp on April 6.
> 4. The language placed in Terry Knapp's April 29, 1981, evaluation referring to his violation of Board policy."

The defendants argued to the district court, in a motion for new trial, that the effect of this instruction was to direct a verdict in favor of the plaintiff. The trial judge responded that:

> "Instruction 10 was given because the Court concluded that the jury had to know that the Court had determined the protected nature of the speech. If this had not been done, the jury would have

been forced to consider the interrogatories in a vacuum. If the speech was not protected the interrogatories were meaningless to begin with."

On appeal, the defendants again claim that instruction 10, in effect, directed a verdict for Knapp.

According to the Supreme Court's reasoning in *Pickering, Mt. Healthy,* and *Connick,* a three-step analysis is required in a case involving the infringement of a public employee's First Amendment right to free speech. *See Czurlanis v. Albanese,* 721 F.2d 98, 103 (3d Cir.1983). The initial issue is one of law, whether the plaintiff's speech is constitutionally protected. *See, e.g., Stern v. Shouldice,* 706 F.2d 742, 747–48 (6th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 487, 78 L.Ed.2d 683 (1983). If this burden is satisfied, the next question is one of fact, whether the constitutionally protected speech was a substantial or motivating factor in the defendant's actions. If this second burden is satisfied, the third question is also one of fact, whether the defendant defeated the plaintiff's claim by demonstrating that he would have reached the same decision in the absence of the plaintiff's constitutionally protected speech. *See, e.g., McKinley v. City of Eloy,* 705 F.2d 1110, 1115 (9th Cir.1983).

In the present case, the district court properly ruled that Knapp's speech concerning inequitable mileage allowance, liability insurance, and the grievance procedure was constitutionally protected, as a matter of law. Once Knapp satisfied this initial burden, he was entitled to have the jury consider the factual issue of whether his constitutionally protected speech was a substantial or motivating factor in the defendants' actions. In order for the district court to present this question to the jury, the court was required to inform the jury of its ruling that Knapp's speech was constitutionally protected. *See, e.g., Czurlanis v. Albanese,* 721 F.2d at 108. Further-

---

**8.** The defendants claim that the admission of evidence concerning (1) Knapp's community service involvement; and (2) Knapp's assignment to Harrison Grade School as punishment, constitute reversible error. The defendants also contend that the district court's failure to admit the psychologist's report into evidence constitutes reversible error. Upon review of the entire record, we deem these conclusory allegations to be without merit.

more, in the context of this case, the district court was required to inform the jury that the defendants could not rely upon Board Policy 2111.10(11) to justify their actions because that provision improperly restricted speech on matters of public concern. Accordingly, we agree with the district court and hold that it was necessary, and not error, to instruct the jury that Knapp's speech was constitutionally protected.

We add that, in the context of this case, the district court also properly instructed the jury that Knapp's First Amendment right to free speech was violated by (1) superintendent Whitaker's oral reprimand of April 1, 1981; (2) superintendent Whitaker's confidential memo of April 1, 1981, to the Peoria School Board; (3) superintendent Whitaker's written reprimand of April 2, 1981; and (4) administrative assistant Hatton's reference to Knapp's violation of Board Policy 2111.10(11) in the evaluation of April 29, 1981. The defendants admit that each of these actions was taken in direct response to Knapp's communication with Peoria School Board members. Thus, in view of our holding that Knapp engaged in constitutionally protected speech, each of the defendants' foregoing actions was constitutionally impermissible.

## D. LEGAL AND EQUITABLE RELIEF

The defendants next argue that the jury's compensatory damage award of $514,333 was "excessive, unreasonable, [and] unsupported by the record." It is well-settled in this circuit that "the actual measurement of damages is an exercise in fact-finding, which we are not permitted to second-guess unless 'after reviewing the entire record, we are left with a definite and firm conviction that a mistake has been committed.'" *Whitley v. Seibel,* 676 F.2d 245, 252 (7th Cir.), *cert. denied,* 459 U.S. 942, 103 S.Ct. 254, 74 L.Ed.2d 198 (1982) (quoting *Busche v. Burkee,* 649 F.2d 509, 518 (7th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981)). Indeed, "[i]n determining whether an award is excessive, we are to accord substantial

deference to the decision of the jury and will not disturb an award unless we are convinced that it is 'monstrously excessive' or 'so large as to shock the conscience of the court.'" *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1275 (7th Cir.1983) (citing *Huff v. White Motor Corp.,* 609 F.2d 286, 296–97 (7th Cir.1979) and *Galard v. Johnson,* 504 F.2d 1198, 1199 (7th Cir. 1974)). *See also Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d 963, 971 (7th Cir.1983).

A review of the trial record reveals that Knapp claimed "roughly $4,000" in financial loss. This damage claim included the revenue lost from Knapp's removal as assistant baseball coach for the 1981–82 academic year, his removal from study hall supervision for the same 1981–82 academic year, and his nominal payments for the uninsured portion of the psychologist's bill. In addition, Knapp claimed mental suffering, emotional distress, humiliation, and loss of professional reputation that he could not "relate in dollars and cents." It is undisputed that the Peoria School District paid Knapp his full salary for teaching and coaching during the 1980–81 academic year and for teaching during the 1981–82 academic year, paid his medical bills, except a portion of his psychologist's bill, and continues to pay him an annual salary in excess of $28,600 for his teaching duties at Harrison Grade School. Based upon all of the evidence presented at trial, the jury awarded Knapp $514,333 in compensatory damages.

■ Knapp's alleged loss of professional reputation stems, in part, from the negative evaluations and memos placed in his personnel file concerning conversations with the Peoria School Board about matters of public concern, his transfer to Harrison Grade School, and his termination as assistant baseball coach at Woodruff High School. At the time the jury considered the issue of compensatory damages, it had no knowledge that Knapp also sought equitable relief in the form of expunging all documents in his personnel file relating to the constitutionally protected speech, reas-

signing him as a science teacher at Woodruff, and reinstating him as an assistant baseball coach at Woodruff. This equitable relief, which was properly granted by the district court in view of the jury's findings, certainly compensates Knapp for a portion of his lost professional reputation. Thus, Knapp's damages consist of $4,000 in financial loss; the mental suffering, emotional distress, and humiliation within the Peoria community resulting from his exercise of constitutionally protected speech; and the loss of professional reputation following the district court's order of equitable relief.

A public school teacher may recover compensatory damages, under 42 U.S.C. § 1983, for out-of-pocket expenses, mental and emotional distress, community humiliation, and loss of professional reputation caused by the infringement of his constitutionally protected speech. *See Solis v. Rio Grande City Independent School,* 734 F.2d 243, 250–51 (5th Cir.1984); *McGee v. South Pemiscot School Dist. R–V,* 712 F.2d 339, 344 (8th Cir.1983). In the present case, however, the jury agreed upon a compensatory damage award in excess of half a million dollars without ever having an opportunity to consider the effect that equitable relief would have upon the award. Our review of the record, and the fact that the district court's equitable relief clearly reduces Knapp's damages for loss of professional reputation, leaves us with a definite and firm conviction that the jury award of $514,333 is excessive. In *United States v. Bruscino,* 687 F.2d 938 (7th Cir.) *(en banc), cert. denied,* 459 U.S. 1228, 103 S.Ct. 1235, 75 L.Ed.2d 468 (1983), we reasoned that when the issue of jury prejudice is raised on appeal, "[t]he trial judge will always be in a better position than the appellate judges to assess the probable reactions of jurors in a case over which he has presided." 687 F.2d at 941. *Cf. Abernathy v. Superior Hardwoods,* 704 F.2d at 971 (trial judge's "superior ability by virtue of having observed the jury first hand, to assess its fairness and competence"). We believe the same rationale applies to the computation of compensatory damages in this case. Accordingly, we remand the case to the district court with instructions that the trial judge review the trial record, "assess the jurors' probable reaction" to the equitable relief, and recalculate the compensatory damage award to an amount between $200,000 and $400,000.

We add that "[u]nder ordinary circumstances a federal court will not review, much less alter, a school board's decision to transfer an employee." *Bowman v. Pulaski County Special School Dist.,* 723 F.2d 640, 645 (8th Cir.1983). This case does not present us with an ordinary circumstance; the jury clearly attributed Knapp's loss of his teaching and coaching positions at Woodruff High School to the exercise of his constitutionally protected speech. Thus, the district court, in order to effectively implement the jury's findings, properly reassigned Knapp to his previous teaching and coaching positions at Woodruff. *Accord McGill v. Board of Ed. of Pekin Elementary Sch.,* 602 F.2d at 776. Indeed, the defendants do not contest the court's authority to reinstate Knapp—the defendants simply argue before this court that Knapp is not properly certified to teach high school level science courses in the State of Illinois. The defendants base their claim upon a portion of a letter dated March 23, 1983, from William Helton, Assistant Manager for the Illinois State Board of Education, stating that Knapp is "not qualified to teach science or health education at the high school level." The defendants contend that they presented this March 23 letter to the district court some six days before the court granted equitable relief, reassigning Knapp to his position as biology teacher at Woodruff High School. Upon review of the record, we are unable to locate any reference by the district court judge to the March 23 letter or any evidence concerning Knapp's lack of teacher certification in the State of Illinois. We find it unusual, if not odd, that Knapp, who taught in the science department at Woodruff for five academic years from September 1977 thru May 1982

and received exemplary ratings, suddenly became "uncertified." In order to clarify this matter, we direct the district court, upon remand, to provide the parties with findings of fact on the issue of Knapp's certification to teach high school level science courses in the State of Illinois.

### E. PUNITIVE DAMAGES

On cross-appeal, Knapp claims that the trial court abused its discretion in denying his motion to amend the complaint to include a claim for punitive damages. The record reveals that on November 12, 1981, Knapp filed his original complaint against Peoria School District No. 150, superintendent Whitaker, principal McDavid, and administrative assistant Hatton, alleging, *inter alia*, that the "Defendants were conspirators engaged in a scheme and conspiracy designed and intended to deny and deprive [Terry Knapp] of rights guaranteed to [him] under the Constitution and laws of the United States...." On the issue of damages, the original complaint requested that the "Defendants jointly and severally be ordered to compensation [sic] Plaintiff in the amount of One Million Dollars." On March 25, 1982, Knapp filed a first amended complaint, adding assistant superintendent Burdette as a defendant but continuing to request that "Defendants jointly and severally be ordered to compensate Plaintiff in the amount of One Million Dollars." The parties continued pretrial discovery and on August 12, 1982, the district court entered the final pretrial order, which included a "written statement of ... contested issues of fact and law" that made no reference to a punitive damage claim. On November 5, 1982, the defendant filed a motion *in limine* to exclude "any evidence or reference to punitive or exemplary damages...." Some two weeks later, on November 22, 1982, Knapp responded to the motion *in limine* by requesting leave to file a second amended complaint alleging, *inter alia:*

"The individual Defendants acting individually and in concert with each other willfully and maliciously took actions which were calculated to punish Plaintiff for the exercise of his rights.

\*　\*　\*　\*　\*　\*

That Defendants HARRY WHITAKER, GEORGE BURDETTE, RUSSELL McDAVID and JOHN HATTON be found liable jointly and severally for punitive damage in the amount of One Million Dollars."

The defendants responded that since the inception of this lawsuit in November 1981, a defense was provided to all the defendants under an insurance policy that included coverage for compensatory damages but excluded the payment of punitive damages. The defendants claimed they would be unduly harmed by a punitive damage claim at this late date because individual counsel would have to be obtained for each defendant to protect his individual interests and, as a result, additional discovery would be required on the issue of punitive damages. On December 17, 1982, the district court denied Knapp's motion to amend, stating that:

"The Court, after weighing the competing interests, finds that substantial prejudice will result to the Defendants if the Plaintiff is permitted to add a punitive damage claim. A party to litigation must be able to rely on the claims and allegations in the pleadings so that he can plan his case. Here, Defendants have prepared for trial relying on the fact that there was no mention of punitive damages in the record and Plaintiff's attorney has given no reason why a request for punitive damages was not expressly mentioned in the original complaint. The interjection of punitive damages at this point in the litigation may require each Defendant to seek separate counsel and force present counsel to recuse himself, causing increased delay and expense."

Knapp initially contends that the original and first amended complaints sufficiently alleged a claim for punitive damages if one liberally construes the language contained therein. We disagree. Neither the original nor the first amended complaint alleged

willful, malicious misconduct on the part of the individual defendants. Similarly, neither complaint made any mention of punitive or exemplary damages in the prayer for relief. In view of the lack of evidence to support Knapp's claim, we agree with the district court that the original and first amended complaints did not adequately state a claim for punitive damages.

Knapp next contends that the district court abused its discretion in denying his motion to amend the complaint to include a claim for punitive damages. Fed.R.Civ.P. 15(a) provides that "[a] party may amend his pleading once as a matter of course at any time before a responsive pleading is served ... [o]therwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." According to the Supreme Court in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), "[i]n the absence of any apparent or declared reason—such as undue delay, ... undue prejudice to the opposing party by virtue of allowance of the amendment ...—the leave sought should, as the rules require, be 'freely given.'" 371 U.S. at 182, 83 S.Ct. at 230. Of course, the grant or denial of a motion to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court. *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *Foman v. Davis*, 371 U.S. at 182, 83 S.Ct. at 230. In deciding whether or not to permit the amendment, "the trial court [is] required to take into account any prejudice that [the non-moving party] would ... suffer [ ] as a result...." *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. at 331, 91 S.Ct. at 802.

▆ The record reveals that Knapp filed the instant lawsuit in November 1981 but waited for over a year, until November 1982, before filing a claim for punitive damages. During this year-long period the parties conducted all necessary discovery and in August 1982, the district court entered a final pretrial order defining the issues to be litigated at trial. The pretrial order made no mention of punitive damages and Knapp offers no reasonable explanation for his undue delay in filing such a claim. Moreover, the untimely filed punitive damage claim, if granted, would have clearly prejudiced the defendants who invested a year preparing their defense to the allegations pleaded, without any notice of a punitive damage claim. According to the defendants, the School District's insurance policy covered compensatory damage awards but not awards for punitive, exemplary damages. The inclusion of a punitive damage claim, well after entry of the final pretrial order, would have forced the parties to reopen discovery and obtain independent counsel to represent their individual interests on the issue of noninsured punitive damages. *See, e.g., Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir. 1982). The undue harm and delay in reopening discovery and obtaining separate counsel would have resulted in additional expenditures on the part of each defendant. In view of this prejudice, and the fact that the plaintiff waited more than one year to amend the complaint to include a claim for punitive damages, we hold that the district court judge did not abuse his discretion in denying Knapp's motion to amend.

## III

We affirm the jury's finding that Peoria School District No. 150 infringed upon Knapp's First Amendment right to speak on matters of public concern and we affirm the denial of Knapp's punitive damage claim, but we remand this case to the district court with instructions to reduce the excessive compensatory damage award to an amount between $200,000 and $400,000. We further direct the district court, on remand, to provide the parties with findings of fact on the issue of Knapp's certification to teach high school level science courses in the State of Illinois.

Circuit Rule 18 shall not apply on remand.