Richard Paul GREENBERG,
Plaintiff-Appellee,

v.

Thomas KMETKO and Bruce Weflen,
Defendants-Appellants.

Richard Paul GREENBERG,
Plaintiff-Cross-Appellant,

v.

Thomas KMETKO and Bruce Weflen,
Defendants-Cross-Appellees.

Nos. 85–2104, 85–2183.

United States Court of Appeals,
Seventh Circuit.

Argued April 17, 1986.

Decided Feb. 3, 1987.

As Corrected Feb. 5, 1987.

James P. Nally, Robert H. McFarland, Asst. Atty. Gen., Chicago, Ill., for plaintiff-cross-appellant.

Sheldon L. Smith, Chicago, Ill., for defendants-cross-appellees.

Before CUDAHY and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Plaintiff-Appellee, Richard Greenberg, was a social worker with the Illinois Department of Children and Family Services (the "DCFS" or the "Department"). Defendants-Appellants were his supervisors. Plaintiff contends that as a result of criticizing the Department's handling of certain cases he was ostracized, reprimanded, demoted and eventually forced to resign. He filed suit under 42 U.S.C. § 1983 alleging that his free speech and fourteenth amendment rights had been infringed. Before the case was submitted to the jury the judge determined that Greenberg had raised a first amendment claim and that defendants' conduct was not excused by the doctrine of qualified immunity. After a bifurcated trial the jury found defendants liable on the first amendment claim but not liable on the fourteenth amendment constructive discharge claim, and then awarded plaintiff $150,000 in compensatory damages. Defendants appeal the finding that plaintiff's conduct was protected by the first amendment and argue that they acted in good faith toward Greenberg and should be shielded from liability by qualified immunity. Defendants also argue that the court misinstructed the jury on the standards for establishing illegal retaliatory conduct. Plaintiff cross-appeals arguing that the fourteenth amendment should provide an additional basis for defendants' liability. We affirm in part and vacate and remand in part.

Greenberg began working for DCFS's North Area Office in Chicago in 1974. De-

fendant Bruce Weflen was the supervisor of plaintiff's unit after October 1974. Defendant Thomas Kmetko was the Area Administrator for the DCFS. Over the course of several years plaintiff had several disagreements with his supervisors over department policy.

DCFS had a policy of trying to minimize the placement of children in foster care by reuniting them with their natural families. Greenberg objected to the application of this policy to a child, Brian C. Brian C. had run away from his family and had become ill. The Department wanted him reunited with his biological parent. Plaintiff objected, saying the parent was unwilling and unfit to care for Brian. Over plaintiff's strenuous objections, Brian was returned to his parent. Within 24 hours of his return, Brian died of a lesion on his appendix that had not received medical care.

Plaintiff's second argument with his supervisors occurred over the handling of the case of Richard S.I. The Juvenile Court had ordered DCFS to place Richard S.I. in a foster home, but this had not been done. Plaintiff informed the court that its order was not being enforced. Defendant Weflen was ordered to appear in court and explain DCFS's nonperformance. Greenberg eventually received permission to place Richard S.I. After this incident, plaintiff contends, he was denied any new casework responsibility even though the volume of cases at the Department increased, and children in his caseload were denied important services.

After placing Richard S.I, plaintiff wrote a letter to defendant Kmetko complaining of difficulties in handling Richard S.I's case and accusing Weflen of having mistaken priorities. Greenberg indicated that his relationship with Weflen was affecting his emotional health. Thereafter, Kmetko met with Greenberg and informed him that he considered Greenberg's mental health a problem.

Greenberg alienated fellow caseworkers by becoming involved with a child in another caseworker's charge. The caseworker in question refused to find a new place-ment for the child who had run away from his old placement. The caseworker was attempting to force the child to return to the former placement. Plaintiff felt the child was being mistreated. Without the other caseworker's knowledge, he gave the child a "Fair and Equal Treatment" Card, which entitled the child to receive the help of a state ombudsman. Greenberg also found the child temporary shelter. Greenberg was called disloyal for this action, and he contends that his supervisor, Weflen, encouraged the other caseworkers to avoid him.

In March 1975, plaintiff received an adverse performance evaluation from Ronald Dombrowski, his former supervisor. The evaluation spoke of Greenberg as a "troubled young man whose personal problems are interfering with his effectiveness, growth and development as a social worker," and suggested that Greenberg "avail[ ] himself of psycho-therapy." Richard Greenberg Six Month Performance Evaluation, Appellants' Appendix Exhibit 3 at 3. After reading this evaluation, plaintiff fell under great stress and from mid-May through mid-June took a leave of absence.

In September 1975, plaintiff became involved in the case of Richard S. II, a child suffering from psychosis and epilepsy with occasional homicidal or suicidal behavior. Richard S. II was in Elgin State Hospital. Plaintiff felt that Richard S. II was not being cared for properly and complained to Phillip Gorman, the assistant guardianship administrator. Gorman resented plaintiff's interference in the case and wrote a letter to defendants Kmetko and Weflen requesting that Richard S. II's case be assigned to another worker.

Greenberg attended a meeting of the Children's Rights Council, a community service organization, on October 10, 1975. The speaker there was Jesse McDonald, a deputy director of DCFS. During a question and answer period, plaintiff rose from the floor and spoke critically of the department's policy of minimizing services to children, especially Richard S. II, who was not mentioned by name. After the speech,

Greenberg and McDonald talked privately, and Greenberg was assured that McDonald would look into Richard S. II's case.

The Richard S. II case continued to disturb Greenberg. The hospital determined that the boy should be transferred to the Edison Park Home. Plaintiff protested, arguing that the home did not have adequate facilities for Richard S. II's special needs. In November 1975, plaintiff learned that Richard S. II had been transferred to an isolation room at the Edison Park Home and that the home was seeking emergency hospitalization for the child. When Gorman refused permission to allow medical care, plaintiff contacted John Shallenberger, the Juvenile Litigation Director of the Legal Assistance Foundation of Chicago, and told him that Richard S. II was being denied essential medical services. Following the Legal Assistance Foundation's involvement in the case, Richard S. II was placed under emergency hospital care.

Soon after Richard S. II was moved to the hospital, plaintiff was transferred to the Title 20 unit, a unit that defendants stipulated was widely viewed as a punishment unit. Workers there had no social work responsibility or contact with children. Their jobs consisted of repetitively filling out forms for federal reimbursement of department services. Plaintiff contends that the transfer harmed his health and ultimately forced him to resign.

In 1978, plaintiff filed suit under 42 U.S.C. § 1983 alleging that defendants had deprived him of his first and fourteenth amendment rights. Before trial, defendants made a motion *in limine* to exclude from consideration all evidence of communications by plaintiff regarding his handling of DCFS cases. The court denied this motion, concluding that the suit pertained to matters of public importance and that their public significance was not outweighed by the Department's concern for efficiency. The defendants also sought summary judgment, saying that they could not have known their actions toward plaintiff were unlawful because, *inter alia,* the Supreme Court did not find intraoffice communications protected by the first amendment until 1979, and that therefore these defendants acted in good faith and should be protected by qualified immunity. The court denied this motion. The court also denied plaintiff's motion for summary judgment on his fourteenth amendment claim for constructive discharge. The case was submitted to the jury first on the question of liability. The jury found for plaintiff on the first amendment claim but for defendants on the fourteenth amendment issue. The jury then tried the issue of damages and returned a verdict of $150,000 to compensate the plaintiff for his wrongful transfer to the Title 20 unit. Defendants appeal the finding of liability under the first amendment. Plaintiff cross-appeals the denial of liability under the fourteenth amendment.

I.

In determining whether plaintiff suffered retaliation for the exercise of his constitutional rights, the first question is whether his comments qualify as protected speech. This inquiry involves a question of law rather than fact. *Connick v. Myers,* 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983). The recognition that public employees retain a first amendment right to comment on public matters dates from *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In *Pickering* the Supreme Court overturned a ruling upholding the dismissal of a teacher who wrote a letter to a newspaper criticizing his school board. The teacher found fault with the way the board allocated funds between athletic and educational programs, and he criticized the Superintendent of Schools for misleading the public as to why he was seeking a tax increase. In ruling that Pickering could not be penalized for exercising his constitutional rights, the Court held that individuals could not be compelled, as a condition of public employment, to relinquish their constitutional rights. The Court noted that "the theory that public employment which may be denied altogeth-

er may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." 391 U.S. at 568, 88 S.Ct. at 1734–35 (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967)).

The standards for assessing when public employees' first amendment rights are implicated received further refinement in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684. There an assistant district attorney was unhappy with a forthcoming transfer. In response, she circulated a questionnaire to her co-workers seeking their opinions about her supervisors' performance and about office morale. She was dismissed and she sued. The court rejected her first amendment claim saying:

> Myers did not seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others. Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo.

461 U.S. at 148, 103 S.Ct. at 1690–91.

■ Essentially nonpublic disputes should not be the subject of court action, lest "every remark—and certainly every criticism directed at a public official—... plant the seed of a constitutional case." *Connick*, 461 U.S. at 149, 103 S.Ct. at 1691. It is only when a comment touches on matters of public concern that free speech rights are at stake. In judging whether an employee's speech addresses a matter of public concern, a court must examine the "content, form and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690.

■ Finding that an employee has commented on a matter of public importance, however, does not end the inquiry. An employee's right to comment on matters of public importance is not absolute. While employees have a right to make known their public views, the government has a legitimate purpose "in promoting efficiency and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service." *Id.* at 150–51, 103 S.Ct. at 1692 (quoting *Ex Parte Curtis*, 106 U.S. (16 Otto) 371, 373, 1 S.Ct. 381, 27 L.Ed. 232 (1882)). As the *Pickering* Court noted:

> [I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

391 U.S. at 568, 88 S.Ct. at 1734–35.

This circuit, in *Egger v. Phillips*, 710 F.2d 292 (7th Cir.) (en banc), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983), identified certain needs of governmental employers that courts should weigh in balancing individual and state rights:

> 1) the need to maintain discipline or harmony among co-workers; 2) the need for confidentiality; 3) the need to curtail conduct which impedes the [employee's] proper and competent performance of his daily duties; and 4) the need to encourage a close and personal relationship between the employee and his superiors where that relationship calls for loyalty and confidence.

710 F.2d at 319 (quoting *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir.1972), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973)).

■ Applying these various standards to the instant case, defendants argue that Greenberg's statements were not speech but were merely the expression of "professional disagreements with his supervisors over the handling of specific cases." Appellants' Brief at 23. Defendants note that

most of Greenberg's statements were made internally within the office and to his supervisors. Because most of the statements involved confidential cases, defendants claim, they were not matters of general public knowledge and hence not matters of public concern.

We disagree and instead concur with the district court that, taken as a whole, Greenberg's comments were not self-serving statements on private affairs, such as were Connick's, but were instead comments designed to right injustices Greenberg saw in the handling of the office's primary responsibilities. Greenberg's comments attempted to inform his supervisors and certain members of the public that children's physical and mental health and even their lives were being threatened. The comments described in the record attempted to show, for example, that court orders were being ignored, that children were being denied essential medical care, and that, in order to save expense, children were being returned to unfit families. The DCFS has an exceptionally important public responsibility—protecting the state's children. As such, we cannot conclude that comments that publicize neglect of this responsibility are not also of exceptional public importance. Nor does it matter that some of plaintiff's conversations were private. These, too, were intended by Greenberg to improve children's care. And, as the Supreme Court concluded in *Givhan v. Western Lines Consolidated School District*, 439 U.S. 410, 414, 99 S.Ct. 693, 696, 58 L.Ed.2d 619 (1979), "A public employee [does not forfeit] his protection against governmental abridgement of freedom of speech if he decides to express his views privately rather than publicly."

■ We also agree with the district court that the government's interest in efficiency in this case does not outweigh the plaintiff's right to speak. The need for discipline and harmony is not as great in the case of individual social workers who have separate charges and responsibilities as it is in the case of policemen or FBI agents who work as part of a "quasi-mili-

tary" team where esprit-de-corps and coordinated effort are essential. *Compare Egger v. Phillips*, 710 F.2d at 319 ("Mutual trust and respect among agents and between agents and supervisory personnel are particularly important in law enforcement. The need for confidentiality cannot be gainsaid. And given the high stakes involved—sometimes life and death decisions are made—the risks of disharmony can be grave."). While confidentiality is important, Greenberg does not appear to have breached his obligation to protect the identity of the individual children about whom he was concerned. To the extent that his role as critic and gadfly impeded his office performance, we believe this negative aspect was offset by the importance his comments had in alerting the courts and state DCFS officials that their orders were being subverted or ignored. Similarly, supervisors who are criticized may always complain that such commentary is injuring close staff relations, but that, by itself, should not be enough to stifle such criticism. We believe the question before us is close because Greenberg did have an adverse effect on office harmony and did not always proceed in the least disruptive fashion. Nonetheless, we see no reason to disturb the district court's evaluation of the balance in favor of the right to speak.

## II.

■ Defendants' second argument is that they are protected from liability under the doctrine of qualified immunity. Under this doctrine, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984); *Coleman v. Frantz*, 754 F.2d 719, 725 (7th Cir.1985). The principle behind the doctrine is that "[i]f the law at that time was not clearly estab-

lished, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. The test for qualified immunity is an objective one that focuses on the state of the law at the time of the alleged violation, *Zook v. Brown*, 748 F.2d 1161 (7th Cir. 1984), and the determination is generally made at the outset of a case to avoid unnecessary litigation.

The Supreme Court has yet to make clear what factors a court must consider in determining whether a right is clearly established. However, as this circuit concluded in *Benson v. Allphin*, 786 F.2d 268 (7th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986), "It would appear that, whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under [*Harlow*]." 786 F.2d at 276. The *Benson v. Allphin* court added, "qualified immunity typically casts a wide net to protect government officials from damage liability whenever balancing is required." *Id.*

 This circuit has considered several cases in which government officials retaliated against public employee speech during the same years as are involved in the instant case. Under these cases, qualified immunity has been found inapplicable when officials have penalized employees for first amendment communications made to individuals outside the office environment. Thus in *Benson v. Scott*, 734 F.2d 1181 (7th Cir.), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 435, 83 L.Ed.2d 361 (1984), Benson claimed the Attorney General's Office retaliated against him after he told news media and law enforcement agents of evidence concerning the Attorney General's selective enforcement of the Cigarette Tax Act and of improprieties in state court proceedings. The court found qualified immunity inapplicable with respect to Benson's claim that he had been harmed for exercising his first

amendment rights. The court noted, "The right of employees to be free from retaliation for their exercise of first amendment rights has been clear since at least 1968, when the Supreme Court decided *Pickering v. Board of Education*. ... The defendants cannot claim that the law was unclear in 1977, when the events at issue in this case allegedly occurred." 734 F.2d at 1185.

In the case at bar, therefore, it should have been clear to defendants Kmetko and Weflen that Greenberg could not be penalized for statements made outside the office. Examples of such statements were Greenberg's comments to the Juvenile Court regarding Richard S. I and his comments at the meeting of the Children's Rights Council and to the Legal Assistance Foundation regarding Richard S. II.

While qualified immunity does not apply to statements made outside the work place, this circuit has applied the doctrine in cases where public employees were penalized for internal office communications made prior to the Supreme Court's 1979 *Givhan* decision. *See Egger v. Phillips*, 710 F.2d at 314–15. As the court stated in *Benson v. Allphin*:

> As for Benson's in-house expressions prior to his termination, this court's decision in *Egger v. Phillips*, is controlling. In *Egger*, we stated that, until the Supreme Court's 1979 decision in *Givhan v. Western Line Consolidated School District*, it was an open question whether on-the-job expressions of public employees were entitled to constitutional protection. *A fortiori*, constitutional protection for such expressions was not clearly established in 1976. Allphin and Rummel are, therefore, entitled to immunity under *Harlow* for those claims relating to Benson's pre-termination, in-house expression.

786 F.2d at 277 (citations omitted).

Thus, qualified immunity does shield the defendants in the present case from liability for penalizing the plaintiff for first amendment communications made *within* the office. The trial court, however, improperly permitted the jury to find the de-

fendants liable for penalizing plaintiff for speech made both within and outside the office. The court submitted to the jury comments made by Greenberg both within and outside the office, and the court instructed the jury that plaintiff had a constitutional right to criticize, both within and outside the workplace, a policy or practice concerning the care and treatment of children. After considering all of this evidence the jury reached a finding of liability. We have no way of determining whether liability was assessed based in whole or in part on actions taken by defendants in response to internal communications. We must therefore vacate the judgment that defendants are liable, and remand for a new trial on the issue of defendants' liability for retaliatory action taken in response to communications made by Greenberg outside the office. We note that on remand this case may involve a dual-motive issue, *see Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), with respect to defendants' responses to plaintiff's statements within and outside the office.

Because in this bifurcated trial the jury also considered the issue of damages and found that the transfer to the Title 20 unit caused plaintiff to suffer $150,000 damages (payable only, of course, in the event liability is affirmed), we affirm the judgment to the extent that it sets the amount of damages at $150,000. On remand the trial shall be limited to the issue of liability.

### III.

■ Defendants' third argument is that the trial court misinstructed the jury on the standards for finding unconstitutional retaliation for the exercise of first amendment rights. In particular the defendants challenge the jury instruction that states:

> In order to recover against any defendant on his free speech claim, the plaintiff [must show] ... ,
>
> ....
>
> ... [that] the defendant was *motivated, at least in part*, by a desire to punish or retaliate against plaintiff for his criti-

cism of the [DCFS] policies and practices; and,

> ... that plaintiff would not have been assigned to the Title 20 Unit had he not criticized the policies and practices.

Transcript at 1249 (emphasis added); *see* Defendants' Brief at 33. The defendants argue that this instruction "abrogates" the proper test, outlined in *Mt. Healthy v. Doyle*, 429 U.S. at 287, 97 S.Ct. at 576, that requires the plaintiff to show that his protected speech or conduct was a substantial or motivating factor in a defendant's decision. When read as a whole, the instructions make clear that the jury must have found that plaintiff's conduct was both a motivating factor and a necessary factor in each defendant's decision to transfer the plaintiff. This instruction is not erroneous. *Cf. McGill v. Board of Education*, 602 F.2d 774, 779 (7th Cir.1979) (approving instruction under which "the jury could not decide for plaintiff unless it found that her constitutionally protected speech was the motivating factor in defendants' decision to transfer her"). We suggest that on remand the district court consider instructing the jury with the equivalent and broadly accepted *Mt. Healthy* standard.

### IV.

■ Plaintiff Greenberg has also filed a cross-appeal asserting that the lower court wrongly denied his motions for summary judgment, directed verdict and judgment notwithstanding the verdict for his claim under the fourteenth amendment that he was denied due process by being constructively demoted and discharged without notice or hearing. He contends that his transfer to the Title 20 unit was an act of punishment because it substituted repetitive, make-work tasks for the contact with children he had enjoyed as a caseworker. This situation caused him great stress which, he argues, forced him to lose income by having to take a voluntary medical leave of absence, and eventually forced him to resign.

The district court instructed the jury on the standards for finding a constructive

discharge in violation of the fourteenth amendment:

> In order to recover against any defendant on his claim for constructive discharge, the plaintiff has the burden of proving each of the following propositions:
>
> First, that the defendant participated in the decision to assign the plaintiff to the Title 20 Unit or to keep him there over his objections;
>
> Second, that in so acting, the defendant was motivated by a desire to make the plaintiff's working conditions intolerable;
>
> Third, that plaintiff's work assignment in the Title 20 Unit was in fact so intolerable that it forced him to resign; and
>
> Fourth, that the defendant deprived the plaintiff of an opportunity for a hearing in regard to the assignment to the Title 20 Unit or the working conditions there.
>
> If you find from your consideration of all the evidence that each of these propositions has been proved as to any defendant or defendants, then you should find in favor of the plaintiff and against that defendant or those defendants on the constructive discharge claim.
>
> On the other hand, if you find from your consideration of all the evidence that any of these propositions has not been proved as to any defendant or defendants, then you should find against the plaintiff and in favor of that defendant or those defendants on the constructive discharge claim.

Jury Instructions Given Before Trial, Jan. 19, 1984, Record Exhibit 171. The jury found for defendants on the constructive discharge claim.

We cannot say that the district court was wrong to reject plaintiff's argument that he established a fourteenth amendment violation as a matter of law. Illinois Personnel Rule 2–470 defines demotion as being moved to a position with a "lower maximum permissible salary." Appendix to Appellee's Brief at 4. Greenberg retained the same salary in the Title 20 Unit and retained his title as Social Worker I.

This circuit has expressed a reluctance to find transfers to the same pay level to be violations of the fourteenth amendment. As this court said in *Parrett v. City of Connersville,* 737 F.2d 690, 693 (7th Cir. 1984), *cert. dismissed,* 469 U.S. 1145, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985):

> In *Lyznicki v. Board of Education,* 707 F.2d 949, 951 (7th Cir.1983), we expressed doubt whether a lateral transfer, involving no loss of pay, could ever be sufficient deprivation to violate the Fourteenth Amendment. A contrary conclusion would subject virtually all personnel actions by state and local government agencies to potential federal damage suits under 42 U.S.C. § 1983—a breathtaking expansion in the scope of that already far-reaching statute, and one remote from the contemplation of its framers.

Nonetheless, we have recognized that under extreme circumstances unbearable conditions alone may establish a constructive discharge. In *Brown v. Brienen,* 722 F.2d 360, 365 (7th Cir.1983), the court held:

> A public employer who drove an employee having a contract of employment to resign by making life unbearable for him, through excessive demands for overtime or other breaches of the employment contract, might be violating the Fourteenth Amendment and section 1983. This would be a case of constructive discharge....

It was within the lower court's discretion to allow the jury to determine whether the conditions of Greenberg's employment were so painful as to establish a constructive discharge or demotion. The jury having spoken, we will not disturb its finding. *See Knapp v. Whitaker,* 757 F.2d 827, 843 (7th Cir.) ("It is well-settled in this circuit that 'a jury verdict will not be set aside if a reasonable basis exists in the record to support that verdict.'") (quoting *Spesco Inc. v. General Electric Co.,* 719 F.2d 233, 237 (7th Cir.1983)), *cert. denied,* —— U.S. ——, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985).

For the foregoing reasons the judgment of the court below is AFFIRMED in part and VACATED and REMANDED in part.

COFFEY, Circuit Judge, dissenting.

The Majority in their opinion conclude that Greenberg, in expressing his disagreement with the decisions of his superiors in two cases, intended "to right injustices Greenberg saw in the handling of the office's primary responsibilities," and therefore his statements concerning this disagreement were protected by the First Amendment because they were directed toward a matter of public concern. The Majority, ignoring the context in which Greenberg communicated his disagreements, allows this self-appointed vigilante to premise his 1983 action on conduct that was clearly intended to overturn decisions of his superiors rather than to focus public attention on the policies of the Illinois Department of Children and Family Services (DCFS).

The Majority improperly upholds the trial court's ruling and the jury's verdict that Greenberg's rights under the First Amendment were violated when he was transferred to another position in the DCFS at the same salary. Greenberg claimed that his reassignment to a position that did not involve him in active casework was intended as punishment for his disagreeing with his superiors. Testimony at trial made clear that the new position was not considered a demotion; rather, the position was very important to the overall operation of the agency [1] since it eliminated the budget deficit that was resulting from the untimely submission of reimbursement requests to the federal government. It is clear to me that Greenberg's transfer was not in response to his exercise of rights under the First Amendment but was unquestionably motivated out of concern for the best interests of those troubled and neglected children needing assistance from the DCFS and also concern for Greenberg himself. The decision to transfer Greenberg was obviously based on his superiors' concern for the children he was working with in having their problems and their solutions entrusted to an emotionally unstable case worker. The decision was also based on the desire to maintain agency morale and efficiency, as well as concern for Greenberg's own psychological and emotional well-being.

---

1. At trial, Kmetko explained the origin and development of the Title 20 Unit—the unit Greenberg was transferred to:

"It had come to my attention in the summer and fall of 1975 that our office, which at that time was one of 18 offices in the state department was not meeting minimum expectations for our clients.

The State Department of Children and Family Services depended in a large part on a federal reimbursement procedure, and as a result, the department was developing a rather significant deficit.

So I began talking with my immediate administrative staff about ways in which we could confront this problem and do a better job of meeting our responsibility to do the required eligibility documentations. So in the fall of '75 I had concluded, somewhat reluctantly, that the most efficient way to do that would be to centralize within that office the responsibility for doing those determinations. I felt that I would have better management control over that task and would have better accountability around getting it done and getting it done in a timely way.

\*　\*　\*　\*　\*　\*

Well, part of the problem was that we had the responsibility for completing those forms spread throughout the entire office, and human nature being what it is, people were deciding their own priorities, depending on what else was going on in the caseload, case emergencies, other kinds of problems, emergency placements, and despite the best intentions of everybody on the staff, it simply was not getting done in the way that it needed to get done.

Up until the time that we decided to create a special unit to do those eligibility determinations, we had virtually every caseworker in the office theoretically responsible for doing them."

Kmetko also stated that the new Title 20 Unit was a success:

"Q. Sir, was the Title 20 unit ever referred to by you as a dumping ground?

A. My experience with Title—no, my experience with the Title 20 unit was very positive, by the way, and I want to say that within two to three months of our putting that in place, our office had developed the best records in the state in terms of completing eligibility requirements for our clients. So we were very, very pleased with the results."

At least four circumstances most eloquently reflected in the record gave Greenberg's superiors good cause to transfer him: (1) Greenberg wrote a letter to his superior Kmetko in which Greenberg stated that his relationship with his superior Weflin was affecting his mental health. He also questioned Weflin's priorities in the letter as to whether Weflin's decisions were based on the best interests of the children or the limited financial resources of the agency. Kmetko, later in a meeting with Greenberg, agreed with Greenberg's own assessment of himself that his (Greenberg's) mental health was a problem; (2) Greenberg interfered with a fellow caseworker by interjecting himself into his fellow worker's case, a case he was not assigned to, without his co-worker's consent or knowledge; (3) Ronald Dombrowski, Greenberg's former supervisor, in an evaluation of Greenberg, described the plaintiff as a "troubled young man whose personal problems are interfering with his effectiveness, growth and development as a social worker," and recommended that Greenberg seek psychotherapy; and (4) Greenberg's inability to deal with Dombrowski's assessment required him to take a leave of absence for approximately a month in order to recover from the emotional and psychological pressures he had created for himself. Standing alone any one of these problems might very well justify Greenberg's transfer, but when considered in their entirety they gave the superiors not only a reason to display concern, but a clear responsibility to transfer him out of casework decision making to a position less challenging and demanding.

Agencies such as DCFS occupy an important role in our society. They are charged with providing support, guidance, and treatment for children that are abused, troubled, insecure, ofttimes unwanted children some of whom may even be mentally deprived. An individual, emotionally unstable and suffering from the type of mental instability manifested by Greenberg's actions, who disrespects his fellow workers to such a degree that he interfered with their cases as well as interfering with profes-

sional medical personnel judgments, has no place assisting children who are suffering from similar problems. The plaintiff, at the time of his employment as a caseworker with the DCFS, was obviously deeply troubled. His superiors were clearly warranted in the best interests of the DCFS, Greenberg and the children, in transferring him to a position (without incurring a loss of pay) with no social work responsibility or contact with children.

The trial court ruled incorrectly as a matter of law without providing any legal reasoning or justification for his ruling that Greenberg's speech was protected under the First Amendment, much less relying on *Connick* which mandates the contrary. The Majority in affirming the district court's decision compounds and perpetuates this erroneous conclusion of law. This court's decision in *Securities and Exchange Commission v. Suter*, 732 F.2d 1294, 1300 (7th Cir.1984) provides the standard of review of the district court's unjustifiable and erroneous conclusion of law: "An appellate court may properly conduct an *independent review* of questions of law determined by a district court" (emphasis added). I do not agree with the Majority's conclusion that Greenberg's expression of his disagreement with his supervisors was protected under the Supreme Court's decision in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), thus I dissent from that portion of the Majority's opinion that approves of the trial judge's misapplication of the law and thus granting Greenberg's bizarre conduct First Amendment protection.

I am well aware that a public employee cannot be required to relinquish his constitutional rights as a condition of his employment. On the other hand, the Majority casts asunder and completely disregards the U.S. Supreme Court decision recognizing a legitimate government interest in "promoting efficiency and integrity in the discharge of official duties, and maintain[ing] proper discipline in the public service." *Connick v. Myers*, 461 U.S. at 150–51, 103 S.Ct. at 1692. Although a public

1068

employee does not give up the right to speak freely on matters of public concern when he accepts employment with a governmental agency, "[i]t is well understood that the right of free speech is not absolute at all times and under all circumstances." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). The First Amendment has never meant "that people who want to propagandize protest or views have a constitutional right to do so whenever and however and wherever they please." *Greer v. Spock*, 424 U.S. 828, 836, 96 S.Ct. 1211, 1216–17, 47 L.Ed.2d 505 (1976). The Supreme Court has acknowledged the impact unrestrained speech and conduct can have on the efficient and orderly operation of the government:

> "In the present case, the Government's interest, and hence the public's interest, is the maintenance of employee efficiency and discipline. Such factors are essential if the government is to perform its responsibilities effectively and economically. To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely effect discipline and morale in the workplace, foster disharmony, and ultimately impair the efficiency of an office or agency."

*Arnett v. Kennedy*, 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974). Thus, a pattern of disruptive conduct including but not limited to statements of a public employee that interfere with the proper functioning of a governmental agency or office are not entitled to special protection merely because the employee happens to be an employee of the government.

The Majority in their futile search to support their faulty reasoning, conclude that Greenberg's comments concerning specific placement decisions of the DCFS were protected by the First Amendment since they addressed what they considered as matters of public concern. In the eyes of the Majority, Greenberg's comments were "intended to publicize [the Department of Children and Family Services'] neglect" of its responsibility to protect the children committed to the DCFS's care. The record is barren of any evidence to support the Majority's opinion that the DCFS was "neglect[ing] [its] exceptionally important public responsibility" of providing appropriate care of the children assigned to the agency; instead, the record clearly establishes that the agency decisions Greenberg disagreed with were based on the underlying theory of protective child placement, namely that when it can be safely accomplished that the troubled child be returned to his natural parents at the earliest possible date. This policy is in accord with generally accepted social welfare policies and was subsequently codified by the Illinois Legislature.[2] *See In Matter of Adoption of R.P.R.*, 95 Wis.2d 573, 581, 291 N.W.2d 591 (Ct.App.1980) (" 'As a general matter, but not invariably, the child's best interest will be served by living in a parent's home' " quoting *LaChapell v. Mawhinney*, 66 Wis.2d 679, 683, 225 N.W.2d 501 (1975)); *In the Interest of T.G.*, 147 Ill.App.3d 484, 101 Ill.Dec. 188, 498 N.E.2d 370, 373 (1986) ("Our courts have long recognized the inherent right of parents to the society and custody of their children and have held that such rights should not be abbrogated without compelling reasons"). The Majority in their effort to protect the plaintiff Greenberg's disruptive and self-righteous speech under the First Amendment ignores the fact that the very agency

2. "Case Plan. With respect to each Department client for whom the Department is providing placement service, the Department shall develop a case plan designed to stabilize the family situation and *prevent placement of a child outside the home of the family*, reunify the family if temporary placement is necessary, or move the child toward the most permanent living arrangement and permanent legal status. Such case plan shall be reviewed and updated every 6 months." Ill.Rev.Stat. Ch. 23 § 5006a.

decisions he so vehemently opposed and interfered with were in compliance with the universally accepted basic social work premise that the most appropriate placement for a troubled, abused and/or neglected child is his return to his natural parents at the earliest possible date when it can be safely accomplished with the necessary support services (DCFS) when indicated. There is no basis to substantiate Greenberg's assertion, made after the fact in his attempt to recover damages from the defendants, that his comments concerning the placement of certain children with their parents were intended to focus attention on a matter of public concern—the agency's neglect of its responsibility to protect the children assigned to it. The Majority accepts Greenberg's bold and unsupported assertion of agency neglect ("court orders were being ignored," "children were being denied essential medical care," and "children were being returned to unfit families," Majority at 1062) and thus condones Greenberg's disruption of agency operations and interference with the agency's ability to protect children.

In order to properly assess Greenberg's claim that he was transferred to a new position allegedly because he exercised his First Amendment right to speak freely concerning the agency's policy of keeping children with their natural parents whenever possible, we are called upon initially to determine whether the trial court committed error in determining that Greenberg's statements were protected speech and submitting Greenberg's claim to the jury. As the Supreme Court explained in *Connick*, the determination of whether a public employee's speech or conduct is protected involves a two-step analysis: (1) whether the speech involved deals with a matter of public concern, and (2) if it does, whether "the interest of the State, as an employer, in promoting effective and efficient public service" outweighs the individual's interest as a citizen in commenting on matters of public concern. *Knapp v. Whitaker*, 757 F.2d 827, 839 (7th Cir.1985). In making this determination, we must keep in mind that:

"*when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.*"

*Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. Finally, if the public employee's speech is protected speech under the *Connick* analysis, then the employee must also establish that his remarks ("speech") were a substantial or motivating factor in the employer's personnel decisions in order to prove a First Amendment violation. *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Knapp*, 757 F.2d at 843.

Examining the question of whether Greenberg's statements (letters, memos, comments) as to his disagreement with his superiors concerning the placement of children assigned to the agency were protected under the *Connick* analysis, it is clear that none of Greenberg's "speech" touched matters of public concern. In *Egger v. Phillips*, 710 F.2d 292, 318 (7th Cir.1983), this court explained "[t]here is a difference between criticism directed at the institution in general and disputes with which the complainant has an intimate personal involvement." Thus, in determining whether an employee's communications (speech) addresses a matter of public concern, we must consider the "content, form, and context of a given statement, as revealed by the full record." *Connick*, 461 U.S. at 148–49, 103 S.Ct. at 1691. In *Knapp*, this court suggested several factors a court must weigh in addressing the question of whether an employee's speech touched on a matter of public concern:

"(1) whether the speech impeded the employee's ability to perform her responsibilities; (2) the importance of close working relationships with superiors and co-workers; (3) the time, place, and manner in which the speech was delivered; and

(4) the context in which the underlying dispute arose."

757 F.2d at 839.

Greenberg publicly criticized the approved and underlying policy of all child welfare agencies, namely the return of children to their parents whenever possible when speaking at a public meeting of the Children's Right Council. Greenberg's statements at this meeting are the only statements in this case that must satisfy the first part of the *Connick* test for protected speech. Even though this may be protected speech under *Connick*, it certainly falls far short of being a legitimate criticism of the DCFS since it conflicts directly with basic social work policy. But the record is barren of any evidence that even suggests that Greenberg was disciplined by his superiors for anything that occurred at the Children's Rights meeting. Therefore, Greenberg's criticism of agency policy at the meeting was not a "substantial or motivating factor," *see Knapp*, 757 F.2d at 843, in his reassignment to a job of equal pay. The record fails to substantiate that Greenberg's criticism of agency policy was a factor in his transfer, but to the contrary there is ample evidence to establish that his own emotional instability certainly disqualified him making well-reasoned judgments concerning his clients.

Turning to Greenberg's disagreements with his supervisors concerning the agency's placement decisions in two cases (Richard S.I. and Richard S.II.), I believe that under the *Connick-Knapp* analysis, his statements expressing his disagreements were not protected speech. Contrary to the Majority's ambiguous assertion that Greenberg intended to "right injustices Greenberg saw in the handling of the office's primary responsibilities," a thorough examination of the record reveals that Greenberg's statements merely expressed his personal discontent with the decisions of his more experienced supervisors as to the proper placement of certain children in Greenberg's case load and fails to establish that any "injustices" occurred in the DCFS's handling of its cases.

Before examining Greenberg's dispute with his supervisors concerning the agency's placement decisions in the Richard S.I. and Richard S.II. cases, I believe it is important to note that Greenberg had little or no social work experience or training at all, and pales in comparison to that of his supervisors, at the time of the events which gave rise to the agency's decision to reassign him to another position. In fact, testimony at the trial established that Greenberg was the least experienced social worker in his unit.[3] Greenberg's lack of experience and training was noted in an earlier performance evaluation issued by Greenberg's immediate supervisor, Ronald Dombrowski, for the period ending in October, 1974, when Dombrowski was reassigned to another position in the agency.

"However, for whatever personal or emotional reasons, Mr. Greenberg seems to have tremendous *difficulty in differentiating his own needs and perceptions from the needs of his clients.* At the time I left the unit in October 1974, I was hopeful that perhaps there might be some change in Mr. Greenberg. I thought that because of his particular personality, *his inexperience and lack of knowledge about agency policies and social work in general,* that he could gain this experience and become effective with his clients...."

(emphasis added). Dombrowski's assessment of Greenberg's inexperience, and his inability to separate his personal needs from the needs of the children in his casework assignments was made long before any of the problems involved in this case occurred. Dombrowski's evaluation also noted with particularity the psychological

---

**3.** The DCFS had four levels of social workers, I–IV; the levels related to the experience of the social worker. Greenberg was classified at the very lowest (bottom) of experience levels, Level I. His supervisors were at least Level III social workers. Thus, Greenberg was the least experienced of the lowest classification of social workers. He joined the Department of Children and Family Services in 1974 with only one year of experience in a field related to social work.

problems Greenberg was having in dealing with his responsibilities as a social worker:

> "On a number of occasions, I did casually discuss with Mr. Greenberg the possibility of him availing himself of *psychotherapy*. I did tell him that if he wanted to make a career in the field of social work and was interested in working directly with clients, he would need, at some point, some *personal psychotherapy*.
>
> In summary, it is my opinion that Mr. Greenberg is a *troubled young man* whose *personal problems* are *interfering* with his *effectiveness, growth and development as a social worker*."

(emphasis added). Dombrowski's suggestion to Greenberg that he might resolve some of the problems that were interfering with his faulty judgment and responsibilities as a social worker by "availing himself of psychotherapy" should be given considerable weight since Dombrowski, his immediate supervisor, was in the best position to evaluate his performance. Thus, the decision of Greenberg's superiors to reassign him and remove him from casework because of the continued conflict and problems that seemed so overwhelming for him is supported by evidence that long predates Greenberg's alleged protected expression. Personnel decisions of an agency made by those in command of a division or department, when based upon facts, experience and expert judgment, should be entitled to the same deference from the courts as any other decision based on the expertise of the agency. Agency personnel decisions involving the expertise of the agency are entitled to deference from the courts. *See, e.g., United Fire Ins. Co. v. Commissioner of Internal Revenue*, 768 F.2d 164 (7th Cir.1985).[4]

In the case of Richard S.I., Greenberg objected to placing the child with his parents. However, both the Area Administrator, Thomas Kmetko, and Greenberg's immediate unit supervisor, Bruce Weflen, after consultation determined that a temporary placement for Richard S.I. could only be made if Richard's parents remained involved in the case, conditioned upon their agreeing to and signing a three-month voluntary placement agreement. Once the juvenile court committed a child to the care of the DCFS it was not required to secure parental consent to place a child, but the idea of keeping parents involved in their children's cases was entirely consistent with the agency's past policy of continuing parental involvement in the hope of maintaining and continuing their interest in the child's welfare, a well-accepted social work policy later codified in Illinois law by its legislature.[5] Weflen testified at trial concerning the case of Richard S.I.:

> "It seems to me that it was a question here of whether or not we should have tried to get a voluntary placement agreement and that was what was taking the time, and it was not unusual for us to try to get a voluntary placement agreement in some cases when we thought that the family would not want to remain involved with the child if we simply placed the child under our right to do so as an agent of the guardian."

Because Greenberg was unable to convince the parents to cooperate and sign the forms, thus remaining involved, the child was unplaced and Greenberg, while making a status report on Richard S.I. to the juvenile court, was questioned by the court as to why the child had not been placed. In all probability, in order that he might coverup his own failure in convincing the child's parents that they should cooperate in the case, Greenberg seems to have deliberately misinformed the juvenile authorities that his superiors in the Department of Children and Family Services, specifically

---

**4.** Greenberg's inability to separate his needs from the needs of the children assigned to him contradicts the Code of Ethics adopted by the National Association of Social Workers: "I give precedence to my professional responsibility over my personal interests." Standards for Social Work Personnel Practices (1968). Indeed, his continued attempts to evade his superiors' decisions violates another ethical obligation: 'I treat with respect the findings, views, and actions of colleagues and use appropriate channels to express judgment on these matters." *Id.*

**5.** *See* note 1, *supra.*

Kmetko and Weflin, were responsible for the failure to place Richard S.I. In fact, it was the failure on Greenberg's part to convince the boy's parents to sign the voluntary placement order that had caused the delay in the placement.

In the case of Richard S.II., Greenberg not only disagreed with the decision of his superiors but took it upon himself to totally disregard the hospital psychologist involved in the child's treatment program at the medical institution where the child was confined. Greenberg's superiors received complaints from Dr. Levitt, head of the mental hospital, that Greenberg was meddling in the child's hospital treatment. The child had serious behavioral problems and was on medication to control epileptic seizures. Greenberg, a neophyte in the social agency, took it upon himself to tell the medical personnel he believed the child needed in-patient medical care, whereas the child's treating medical professionals determined, and Greenberg's superiors concurred, that Richard S.II. could be released from confinement and placed in a non-medical facility. After the child was discharged and placed in a non-medical facility, Greenberg attempted to superimpose his predilections as to the proper treatment of the child on the agency in taking the matter into his own hands and contacting the Director of the Legal Assistance Foundation, again without the agency's knowledge or approval. Thus, in the cases the Majority relies upon to search for support for its conclusion that Greenberg was penalized for exercising his First Amendment right of free speech, the matters involved concerned disagreements with placement decisions of his more experienced and expertly trained social workers in charge of his unit and his frustration at being unable to superimpose his judgment as to two wards of the DCFS on his superiors. Under no circumstances can these two isolated instances of disagreement be considered as matters of public concern.

Finally, the Majority infers that Greenberg's criticisms of the DCFS were legitimate from the fact that one child, Brian C., died from a lesion on his appendix short-ly after his return to his parents over Greenberg's objections. The Majority insinuates that Greenberg's concern that harm would result to the child if he was returned to his parents was justified because the child died the day after his parents took custody of the child. But the record fails to establish that Brian C.'s parents were in any way responsible for the boy's death. The first signs of the boy's illness appeared some four days prior to the date he was released from juvenile detention to the custody of his parents. The boy collapsed in a gas station and was taken to a local hospital, where he was released to a juvenile home after he was examined. The day before his parents took him home, Brian C. once again collapsed in the detention facility and was diagnosed as suffering from severe abdominal cramps. Thus, prior to returning home with his parents, trained medical professionals and those administering the detention home where Brian was confined were aware of Brian's intestinal problems and had failed to properly diagnose and treat the problem. If these trained professionals were not able to accurately diagnose Brian's illness, how were the parents at fault, as the Majority implies, if trained medical personnel could not identify and treat the problem? In addition, how can the DCFS be held responsible for the unfortunate death of the boy when trained medical professionals could not detect the nature of the child's illness? If anything, there may have been possible negligence on the part of the medical personnel who examined Brian C. but how do we transfer this fault to the DCFS? Further, there is no evidence that the child would have survived had he been placed outside the parent's home. Thus, the death of Brian C. after he was returned to his parents over Greenberg's objections does nothing to explain or vindicate Greenberg's criticisms of the Department of Children and Family Services' sound policy of returning children to their natural parents at the earliest possible moment in their attempt to keep the family unit together.

I am at a loss as to how the Majority can conclude that the First Amendment was ever intended to give protection to a frustrated, disruptive, emotionally troubled, agitator like Greenberg whose statements fail to meet the test of valid matters of public concern. The Majority asserts that:

"[t]o the extent that his [Greenberg's] role as critic and gadfly impeded his office performance, we believe this negative aspect was offset by the importance his comments had in alerting the courts and state DCFS officials that their orders were being subverted or ignored"

and surprisingly admits that Greenberg's conduct interfered with the functioning of the agency:

"[we] believe the question before us is close because Greenberg *did have an adverse effect on office harmony and did not always proceed in the least disruptive fashion.*"

I am unable to find support in the record for the Majority's assertion that orders of the courts or DCFS officials were being "subverted or ignored." The only orders of DCFS officials involved in this case were those of Greenberg's supervisors—and it was Greenberg who disobeyed those orders. The Majority apparently concludes that the agency's failure to timely place Richard S.I. was an attempt by the agency to "subvert or ignore" a court order; however, the record makes clear that the agency was in fact in the process of complying with the court's order and placing Richard S.I. and that the delay in achieving a temporary placement of the child, as pointed out earlier, was *not* the result of the agency's decision to subvert or ignore the court's placement order, but rather, resulted from the ineptitude and failure of Greenberg to obtain the cooperation of the parents in signing a participation agreement. As the Fourth Circuit explained when discussing protected speech under the First Amendment:

"Some of the affidavits refer to what seems to be bickering and running disputes with the department heads. We do not intend to suggest that that kind of speech is protected by the First Amend-

ment in the sense that it may not be considered in connection with the termination of the employment relationship. A college has a right to expect a teacher to follow instructions and to work cooperatively and harmoniously with the head of the department. If one cannot or does not, if one undertakes to seize the authority and prerogatives of the department head, he does not immunize himself against loss of his position simply because his noncooperation and aggressive conduct are verbalized."

*Chitwood v. Feaster,* 468 F.2d 359, 360–61 (4th Cir.1972). According to this court's decision in *Knapp,* we must consider the following in determining whether Greenberg's disagreements with his superiors concerning placement decisions touched on matters of public concern:

"(1) whether the speech impeded the employee's ability to perform her responsibilities; (2) the importance of close working relationships with superiors and coworkers; (3) the time, place, and manner in which the speech was delivered; and (4) the context in which the underlying dispute arose."

757 F.2d at 839. Applying these factors to Greenberg's almost constant strife with his superiors, it is evident that Greenberg's disagreements in the cases of Richard S.I. and Richard S.II. were just one segment of the running scenario of "bickering and running disputes" he had with his superiors. As the court explained in *Chitwood,* the fact that the frustrated Greenberg verbalized his "noncooperation and aggressive conduct" does not immunize him against a change in assignment; in fact, it provided good cause for a change of assignment in order that his disruptive conduct might not further interfere with the agency's responsibilities to the children assigned to its care. Conversely, if the agency had not acted as they did in transferring Greenberg they might very well be held liable when recounting the numerous examples of Greenberg's emotional instability had any harm come to any of the children assigned to his care and custody. Applying the first

factor of the *Knapp* analysis, Greenberg himself admits and concedes that his disagreements with his supervisors impeded his ability to perform his responsibilities as a social worker and was affecting his mental health; in fact, he took a leave of absence because of his admitted difficulty in complying with the agency's placement decisions in the Richard S.I. and Richard S.II. cases. Under the second factor in the *Knapp* analysis, the Majority owns up to the fact and admits that Greenberg's disagreements adversely effected office harmony and that his conduct was generally disruptive. The record establishes that not only did Greenberg's actions cause problems in his own cases, but that he even went so far as to take it upon himself to interfere with the casework decisions of others in his unit and told them how to and not to handle their cases. The other social workers complained to the unit supervisor and office administrator about Greenberg's unwarranted interference with their cases. It is impossible to maintain the necessary *esprit de corps,* pride and collegiality, and discipline that an agency needs in order that it might provide the proper care of children assigned to it when the least experienced (lowest man on the totem pole) person in the office sees fit to take things into his own hands, defying specific agency policy and orders of his superiors thus demonstrating an utter lack of respect for the professional judgment of his more experienced colleagues. He not only interfered with his fellow social workers, but also attempted to superimpose his judgment on the medical personnel involved with the DCFS in treating the children. *See, e.g. Jennings v. Tinley Park Community Sch. Dist.,* 796 F.2d 962 (7th Cir.1986) (Coffey, J., dissenting) (emphasizing importance of trust and confidentiality to employment relationship). Applying the third factor of the *Knapp* analysis, Greenberg's dispute concerning the placement of Richard S.I. and Richard S.II. was expressed to his superiors in intra-office comments (including letters and memos) not intended to reach the public ear. Thus, I fail to understand how the Majority can hold Greenberg was focusing *public* attention on a matter of public concern when he was only communicating his disagreements intra-office to other agency employees. The statements Greenberg made to the juvenile court and the Legal Assistance Foundation did not draw attention to matters of public concern since they related only to two specific cases and were clearly directed toward reversing decisions by his superiors that Greenberg disagreed with, rather than exposing what the Majority has improperly construed as continued neglect on the part of the agency in caring for the children assigned to it. Under *Knapp,* Greenberg had no basis to claim that the agency continually neglected its responsibilities because there was no foundation for such an allegation; instead, he interfered with the agency's operation by involving outsiders (e.g. the Legal Assistance Foundation) in agency decisions that were based on sound and experienced professional and medical judgment. Finally, under the *Knapp* analysis we must not forget Greenberg's disagreement with his superiors involved a dispute between Greenberg, an inexperienced social worker, and his more qualified supervisors, colleagues, and expertly trained medical personnel as to the proper care for Richard S.I. and Richard S.II. This dispute was not a matter of public concern because it involved only a matter of professional judgment and how that judgment might best be exercised in specific cases. Clearly, as the Supreme Court stated in *Connick,* every disagreement concerning the proper exercise of professional judgment, in every public agency, is not a matter of public concern.

> *"To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official—would plant the seed of a constitutional case.* While as a matter of good judgment, public officials should be receptive to the constructive criticism offered by their employees, *the First Amendment does not require a public office to be run as a roundtable for*

*employee complaints over internal office affairs."*

461 U.S. at 149, 103 S.Ct. at 1691. Thus, under the factors set forth in this court's opinion in *Knapp,* Greenberg's disagreement with his superiors concerning the placement of Richard S.I. and Richard S.II. cannot be classified as matters of public concern and therefore his statements concerning that disagreement were not protected according to the Supreme Court's decision in *Connick.*

Greenberg was more than just a "gadfly" as the Majority contends;[6] he was an abrasive and emotionally unstable and disruptive individual in a social welfare agency where cooperation and mutual respect are essential to the proper functioning of the organization. Greenberg's "running dispute" with his supervisors interfered with the very efficiency of the agency as well as agency morale and the proper placement of its clients. Obviously, from a reading of this record, Greenberg was unqualified to meet the challenges and the myriad of complex problems that confront even a well-trained, experienced, and emotionally balanced social worker. Kmetko and Weflin had discussed Greenberg's emotional and psychological problems prior to reassigning Greenberg to Unit 20. Greenberg himself in a letter to Kmetko admitted that his relationship with Weflin was affecting his emotional health. (In the same letter he questioned Weflin's priorities.) Second, Greenberg had consistently undermined the work of his fellow caseworkers as well as the work of medical professionals treating the wards of the agency. Third, one of Greenberg's former supervisors, Ronald Dombrowski, had previously described Greenberg in an evaluation as a "troubled young man whose personal problems are interfering with his effectiveness, growth and development as a social worker," and recommended that Greenberg seek psychotherapy. Finally, when Greenberg learned of this evaluation he was so distraught that he requested a month's leave to hopefully regain control of himself. All of these circumstances demonstrate Greenberg's severe emotional problems and lack of proper personal direction and judgment. Thus, the agency's decision to reassign Greenberg freed him from the problems he found so overwhelming and prevented Greenberg's personal frustrations from affecting and interfering with the proper judgment so necessary in the vital placement decision of the children committed to the agency. A person with Greenberg's emotional and psychological problems is hardly qualified to be entrusted with and actively involved in determining the proper placement of children who likewise suffer from their own emotional and psychological problems. To allow every public employee, and above all Greenberg with his panoply of problems, who disagrees with the decision of his supervisor, disrupts office procedures, usurps the authority and the decision-making perogative of his supervisors unto himself in the guise of "right[ing] injustices [he sees] in the handling of the office's primary responsibilities," is contrary to the mandate of the United States Supreme Court "that the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick,* 103 S.Ct. at 1691.

Finally, I do not believe this is an appropriate case to reverse the judgment of liability against the defendants but leave the jury's assessment of damages standing. The Majority reverses the judgment of liability because

> "[w]e have no way of determining whether liability was assessed based in whole or in part on actions taken by defendants in response to internal [unprotected] communications."

Although this court has acknowledged the propriety of allowing a damage award to stand when reversing a judgment of liability and remanding the question of liability to the district court, *Dazenko v. James Hunter Machine Co.,* 393 F.2d 287 (7th

---

**6.** A gadfly is one "that acts as a constructively provocative stimulus," American Heritage Dictionary, 543 (2d ed. 1982). Greenberg's effect on the agency was hardly "constructive."

Cir.1968), I have very serious doubts that this is an appropriate case to let the damage award stand on remand. *See also Soderbeck v. Burnett Co.*, 752 F.2d 285, 293 (7th Cir.1985) (new trial can be limited to liability where "the liability and damage issues are *logically distinct* ") (emphasis added). The confusion on the jury's part that the Majority accepts, justifies reversing the judgment of liability might also very well have had an effect on the jury's determination of damages. Just as we do not know the effect the failure of the trial court to distinguish interoffice non-protected speech from speech made outside the agency had on the jury, I believe that it creates a most serious question that the confusion permeated the jury's assessment of damages. The proper procedure in a case where a jury's finding of liability is reversed on grounds that the jury may have been confused as to the law involved is to reverse the damage award as well and allow a complete new trial on the issue of damages in the interest of fairness and justice, should the jury find the defendants liable, on the basis of a correct understanding of the law.

The district court without providing any legal reasoning or justification erroneously determined as a matter of law that Greenberg's statements were protected speech. The Majority, in affirming the district court's determination to submit Greenberg's claim to the jury, compounds and perpetuates the district court's error. The Majority completely ignores the serious problems Greenberg created much less giving any credence to the problems his emotional and mental instability created for the DCFS in its handling of the children who were assigned to the agency. The record clearly demonstrates that Greenberg's superiors had ample cause and in fact a duty to transfer him to another position not involving casework responsibilities. Greenberg himself wrote a letter to Kmetko (1) stating that his relationship with Weflin, his superior, was affecting his mental health, and (2) questioning Weflin's priorities. Kmetko in a meeting with Greenberg agreed that Greenberg's mental health was a problem. Second, Greenberg interfered with his fellow workers' cases without their consent or knowledge and also with the professional medical personnel. Third, Ronald Dombrowski, Greenberg's former supervisor described the plaintiff as a "troubled young man whose personal problems are interfering with his effectiveness, growth and development as a social worker," and recommended that Greenberg seek psychotherapy. Finally, when Greenberg became aware of Dombrowski's evaluation of him, he requested and received a month's leave of absence in order that he might come to grips with his problems. Any one of these problems would have justified Greenberg's transfer, but when these problems are considered *in toto* in their proper context, Greenberg's superiors were not only clearly justified, but had a duty to transfer him to a position (without a loss of pay) not involving casework responsibilities and thus less demanding and challenging and more suited for his psychological make-up.

The First Amendment was never intended to immunize a person's unwarranted interference with his superiors' well-reasoned decisions concerning child placements as well as their subordinate employees' job assignments. This is especially true when the individual responsible for creating the chaotic turmoil in the agency was suffering from emotional and mental distress during the very period of time he was attempting to substitute his judgment for that of the agency. The Majority, in holding that Greenberg's statements and actions were protected, allows the First Amendment to be used as a shield for Greenberg's demonstrated incompetency to the disadvantage of the children who depend on the DCFS for the protection and help they need to have a stable and healthy childhood. Therefore, for the reasons stated, I would reverse the judgment and damage award against the defendants and remand the case to the district court for a new trial on liability and damages.